Oak Motors, Inc. v. Commissioner.
Oak Motors, Inc. v. Commissioner
Docket No. 377-62.
United States Tax Court
T.C. Memo 1964-86; 1964 Tax Ct. Memo LEXIS 251; 23 T.C.M. (CCH) 520; T.C.M. (RIA) 64086; March 31, 1964
Lowe Watkins, Commerce Union Bank Bldg., Nashville, Tenn., and Dan E. McGugin, Jr., for the petitioner. William F. Franklin, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years and in the amounts set forth below: Taxable Year
Deficiency
1958
$1,624.21
1959
2,815.29
1960
1,571.84 The sole issue for decision is whether amounts claimed by petitioner in each of the taxable years as interest expense were in fact properly deductible "interest * * * on an indebtedness" within the purview of section 163(a) of the Internal Revenue Code of 1954. Findings of Fact Many of the facts *252 were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. Oak Motors, Inc. (hereinafter referred to as petitioner), is a Tennessee corporation having its principal place of business in Nashville, Tennessee. Its Federal income tax returns for the calendar years 1958, 1959, and 1960 were filed with the district director of internal revenue at Nashville. Petitioner is a franchised dealer in automobiles manufactured by the Ford Motor Company. Prior to April 1, 1953, the Ford dealership now possessed by petitioner was owned and operated by Seventh Avenue Motors, Inc., a corporation the majority of whose stock is owned by Lemuel B. Stevens. During this time Seventh Avenue also owned and operated a public parking garage and both of these businesses were conducted in a building owned by Seventh Avenue in downtown Nashville. Sometime prior to April 1, 1953, Seventh Avenue determined that it would be more advantageous to devote its entire downtown building to the public parking garage business and to separate from this enterprise its Ford dealership. Accordingly, on April 1, 1953, petitioner was formed by Seventh Avenue *253 for the purpose of acquiring and separately operating said Ford dealership. Upon formation all of petitioner's stock was issued to Seventh Avenue. From Seventh Avenue petitioner purchased its inventory of automobiles, parts, tools and equipment giving in exchange therefor its note for $210,000 payable in installments ending on April 1, 1960. Petitioner then moved its place of business from Seventh Avenue's downtown building to a separate location in Nashville. In the period immediately following the Second World War automobile manufacturers and dealers experienced what is known as a sellers' market. However, by the early 1950's production was approaching demand and the automobile economy was entering a buyer's market. In this buyers' market the Ford dealership operated by Seventh Avenue prior to April 1, 1953, had not done well. Concerned with this result, the Ford Motor Company prevailed upon Lemuel B. Stevens, majority stockholder of Seventh Avenue, to change its management. With a view to so doing, Stevens contacted E. P. Boyte, a highly qualified salesman of Ford automobiles who was then the manager of Hull-Dobbs, a Knoxville, Tennessee, Ford agency. Boyte had earlier expressed *254 to Stevens his desire to join a Ford dealership in which he might participate as an owner rather than merely as an employee. Stevens offered Boyte that opportunity. On April 22, 1953, Boyte and Stevens purchased from Seventh Avenue all of petitioner's stock for $100,000. Of the total number of outstanding shares, Boyte received 49 percent in exchange for his demand note for $49,000 and Stevens received the remaining 51 percent for which he gave Seventh Avenue his demand note for $51,000. Both of these notes were fully paid on October 15, 1953. Immediately following the April 22 stock purchase, petitioner's shares were owned as follows: Class
Class
A Shares
B Shares
Lemuel B. Stevens
1,020
4,080
E. P. Boyte
980
3,920
Total
2,000
8,000
On April 23, 1953, an agreement was entered into between Boyte, Stevens, and petitioner which provided that should either stockholder desire to dispose of his stock, the other stockholder or petitioner, would have the right of "first refusal." The agreement further provided that should "Ernest P. Boyte be discharged from the employ of the corporation either L. B. Stevens, or the corporation, shall purchase his shares *255 of stock * * *." Under the general management of Boyte petitioner's business prospered during the remaining part of 1953 and 1954. However, in the fall of 1955 business began to decline, and it became apparent to Boyte that petitioner was generating insufficient profit to support both him and Stevens. Boyte therefore asked Stevens to buy him out under the terms of the April 23, 1953, agreement. Initially, Stevens agreed, offering to purchase Boyte's 49 percent stock interest at book value. Boyte thereupon left Nashville to seek another job. When he returned some weeks later to complete the sale of his stock, a turnabout occurred. Stevens then offered to sell Boyte his 51 percent interest provided Boyte could raise the money within a specified period of time. Because almost all of his own funds were already invested in petitioner's stock Boyte personally lacked the money to purchase Stevens' shares. Although he tried to borrow the money on his own credit from third parties, he was unsuccessful. Shortly before the expiration of Stevens' offer, Boyte was contacted by Sam M. Fleming, president of the Third National Bank in Nashville. Neither Boyte nor petitioner were customers of the *256 Third National Bank at this time. Fleming, however, knew that Stevens had offered to sell Boyte his interest in petitioner. He also knew that petitioner, as one of the largest Ford dealers in the area, was a substantial generator of the type of commercial finance business which is of great profit to the finance department of a bank. While this business had previously gone to various financial institutions in which Stevens was interested, Fleming was anxicus, if he could, to obtain it for the Third National. Fleming discussed the situation with Boyte. Stevens wanted $92,000 (the then book value) for his 51 percent interest in petitioner. Additionally, petitioner was still indebted to the Stevens-owned Seventh Avenue Motors, Inc., for $150,000 which represented the balance due on its April 1, 1953, note. While Fleming was unwilling for the Third National Bank to loan Boyte personally the necessary funds, he was, however, willing for the bank to lend petitioner, the sum of $242,000, an amount sufficient for it to both redeem Stevens' stock and extinguish its indebtedness to Seventh Avenue. On the same day that the above mentioned discussion took place, November 10, 1955, petitioner *257 borrowed from the Third National Bank the sum of $242,000 giving in exchange its note in that face amount payable 15 days later. The note was of a short duration because of several factors. First, time was of the essence since the limit on Stevens' offer was about to expire. Second, its was feared by both Boyte and Fleming that if Stevens, with his banking associations, had found out the money was being borrowed from a bank in which he was not interested, he might have changed his mind about selling. It was contemplated by Fleming that once the transaction had been completed, long term financing of petitioner's obligation would then be worked out. With the money which it borrowed from the Third National petitioner, on November 10, 1955, redeemed its stock held by Stevens (and members of his family) for approximately $92,000 and completely paid its debt to Seventh Avenue in the amount of $150,000. The retired Stevens stock was then cancelled and never reissued. Immediately after this transaction all of the outstanding stock of petitioner was owned by E. P. Boyte. Sometime after November 10, but before December 1, 1955, a trial monthly balance sheet was prepared by petitioner's secretary. *258 This balance sheet revealed that the $92,000 increase in petitioner's liabilities resulting from the November 10 transaction [1] had so changed its financial condition as to place its franchise with the Ford Motor Company in jeopardy (since Ford required its dealers to maintain a certain minimum net worth below which petitioner had now fallen). Boyte returned to the Third National Bank and discussed this situation with Fleming who, because the bank dealt with other Ford dealers, was familiar with the problem. In order to cure its balance sheet defect, and at Fleming's suggestion, petitioner's $242,000 loan at the Third National Bank was, on December 1 was rearranged in the following manner. Petitioner *259 paid $8,000 on its $242,000 note thus reducing the balance to $234,000. Concurrently, petitioner executed to the Third National two new notes, one for $42,000 due December 15, 1955, and one for $100,000 payable in installments over a period of years. [2] As to the remaining $92,000 of the original loan, the bank formally lent this sum to Boyte, who in turn loaned it to petitioner. In exchanges for his loan petitioner gave Boyte its note, payable in fixed installments, for $92,000, such note being "subordinate to the rights of all other creditors" of petitioner. Boyte then pledged petitioner's subordinate note, together with all of petitioner's stock, as collateral for the $92,000 loan which the bank had formally made to him. Following these transactions the Third National Bank cancelled petitioner's November 10, 1955, note in the amount of $242,000. In its place the bank then held two of petitioner's notes totaling $142,000 plus one note of E. P. Boyte in the sum of $92,000 secured by pledge of the $92,000 subordinate note executed by petitioner in favor of Boyte. *260 Petitioner's November 10, 1955, indebtedness to the Third National Bank was rearranged as described at the suggestion of the bank solely for the purpose of satisfying the minimum net worth requirements of the Ford Motor Company. Although the bank, in order to retain petitioner as a customer, was willing in effect to substitute E. P. Boyte as a debtor in place of petitioner to the extent of $92,000, the bank clearly looked to petitioner as the source of repayment for such $92,000. It was specifically understood and expected by both Boyte and the bank that Boyte would use the funds paid him upon petitioner's note to repay his own note to the bank, and that the arrangement was a temporary one motivated purely by considerations of financial expediency. By the beginning of 1962 petitioner had reduced to $89,000 its debt to E. P. Boyte on its $92,000 note. Petitioner had also reduced to $22,000 its indebtedness to the Third National Bank on the $142,000 loan. Its financial position was now sufficiently secure for it to reassume directly the obligation borne by it prior to December 1, 1955. This reassumption was accomplished in the following manner. On January 25, 1962, petitioner borrowed *261 from the Third National Bank the sum of $100,000 of which $22,000 was used to pay off the $22,000 balance owing the bank and the remainder went to the general credit of petitioner. Petitioner then issued to Boyte its check for $90,890.03 in complete satisfaction of the subordinated note, and Boyte in turn issued his check in the same amount to Third National in satisfaction of his note. During each of the taxable years 1958, 1959, and 1960 petitioner deducted as interest expense the sum of $5,414.02 paid to E. P. Boyte on its $92,000 note held by him. Respondent disallowed these deductions for all years on the ground that petitioner had not "established an indebtedness upon which the claimed interest * * * was paid or accrued." Ultimate Finding The $92,000 advance made by E. P. Boyte to petitioner on December 1, 1955, was a bona fide loan and amounts paid by petitioner to Boyte during the taxable years in respect to such loan constitute interest paid on an indebtedness within the purview of section 163(a), Internal Revenue Code of 1954. Opinion It is respondent's position that the advance which E. P. Boyte made to petitioner on December 1, 1955, was *262 a contribution to petitioner's capital and that, therefore, the annual payments of $5,414.02 made by petitioner to Boyte in respect to such advance do not constitute interest deductible under section 163(a) of the 1954 Code. Petitioner, on the other hand, contends that Boyte's advance was a bona fide loan and that the payments which it made to Boyte represent deductible interest. As thus narrowly framed, the issue is whether Boyte's advance constituted a bona fide loan giving rise to a valid indebtedness or whether it was merely a contribution to petitioner's capital. Our ultimate conclusion, drawn from a consideration of all the facts, is that this issue must be decided in petitioner's favor. It is now a settled proposition of tax law that a shareholder may also be a creditor of his corporation, and this is true even though he is the sole shareholder. Campbell v. Carter Foundation Production Company, 322 F. 2d 827 (C.A. 5, 1963). Courts must, and they should, give careful and searching scrutiny to all the facts and circumstances surrounding a purported loan transaction, for there is an undoubted temptation to cast a capital investment as a loan and thus permit a tax *263 deduction in the form of interest on that "loan" for what is in reality a nondeductible dividend on invested capital. Where, however, there is an evident intent of the stockholder to be a lender, and the corporation to be a borrower, and the other facts and circumstances are not such as to negative the existence of such an intent by the parties, we think that that intent should be respected and given effect. The facts and circumstances emphasized by respondent as denigrating a debtor-creditor relationship between Boyte and petitioner are mainly the "thin" nature of petitioner's capital structure following the December 1, 1955, advance and the subordination of Boyte's purported loan to the claims of all other creditors. However, the "thin incorporation" factor is robbed of relevance when it is considered that the same capital structure obtained with respect to petitioner on November 10, 1955, after the Third National Bank, an unrelated third party, had loaned petitioner $242,000 in a transaction which respondent does not deny was bona fide. Likewise, the subordination of Boyte's loan has little meaning when it is observed that during the taxable years partial repayments upon such *264 loan were actually made and that in January of 1962 it was fully satisfied. What is pertinent here is that between November 10 and December 1, 1955, a bona fide indebtedness existed between petitioner and the Third National Bank. This indebtedness had to be rearranged prior to the close of 1955 in order to comply with the minimum net worth requirements which the Ford Motor Company imposed upon its franchised dealers. The December 1 transaction was solely a method of accomplishing this end. Since the bank, which had already loaned petitioner the money, could not itself accept a subordinated note, E. P. Boyte was interposed between petitioner and the bank. For this purpose, he was a mere conduit and nothing else. The evidence shows that the Third National Bank, with whose president the plan originated, considered Boyte's advance - and the note which represented it - to be a bona fide debt of petitioner. This is corroborated by the fact that the bank clearly was relying on repayment of petitioner's indebtedness to Boyte to enable Boyte to repay his own loan, in the same amount, to the bank. On the basis of such evidence it is our decision that during the taxable years in issue there *265 existed between petitioner and E. P. Boyte a bona fide indebtedness and that the sum of $5,414.02 which petitioner paid Boyte in each of these years represents interest on that indebtedness. Decision will be entered for the petitioner. Footnotes
1. While petitioner borrowed on November 10 the sum of $242,000 from the Third National Bank, $150,000 of this money was used to extinguish a pre-existing balance sheet liability of petitioner to Seventh Avenue. As to this $150,000 the bank was merely substituted for Seventh Avenue as a creditor. However, the remaining $92,000 of the loan, used by petitioner to redeem and cancel Stevens' stock, represented a new liability which operated to reduce petitioner's existing net worth.↩
2. The indebtedness was divided into two separate notes since it was anticipated that petitioner would be able to repay about $42,000 to the bank during the month of December 1955 out of a year-end bonus due it by the Ford Motor Company.↩