Herbert A. DUNN and Georgia E. Dunn, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 45, Docket 79–4038.

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 1979.

Decided Jan. 30, 1980.

Ernest J. Brown, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, William A. Friedlander, and Michael J. Roach, Attys., Tax Division, Dept. of Justice, Washington, D. C., of counsel), for the Commissioner, appellant.

Robert M. Tyle, Rochester, N. Y. (Kaufman, Kenning, Tyle & D'Amanda, Rochester, N. Y., of counsel), for appellees.

Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and DOOLING,[*] District Judge.

DOOLING, District Judge:

The Commissioner appeals from a decision of the Tax Court (Theodore Tannenwald, Jr., Judge) holding that amounts received by appellee taxpayer, Georgia Dunn,[1] in 1970 and 1971 from Bresee Chevrolet Co., Inc. ("Bresee") were received in complete redemption of all her stock in Bresee, and that immediately after the distribution she had no interest in Bresee as an officer, director, employee or otherwise, other than an interest as a creditor. In consequence, the Tax Court held, the amounts the taxpayer received were capital gains and not dividends, as the Commissioner contended.

When the redemption transaction was entered into the taxpayer owned 249 of the 500 shares of Bresee, her son William Dunn

owned 149 shares and each of her married daughters owned 51 shares. In May 1970 taxpayer contracted to "sell or redeem from" Bresee her 249 shares of the company's stock for $335,154 payable $100,000 on June 1, 1970, and the balance with 5% interest over a period of ten years. Bresee redeemed the taxpayer's stock on the June 1, 1970, closing date; she was then paid the $100,000, and in 1971 was paid $45,260.34.

In general a corporation's distribution of money or any other property to a shareholder with respect to the corporation's stock is treated as a dividend to be included in the shareholder's gross income to the extent of the earnings and profits of the corporation.[2] Code §§ 301(a), (c), 316(a), 317(a). However, basically a corporation's distribution in redemption[3] of its own stock is treated as in part or full "payment in exchange for the stock," taxable to the extent only of any capital gain. Code § 302(a). Section 302 treats redemptions as exchanges within Section 302(a) if they qualify under one of the four subsections of Section 302(b): the subsection under which the taxpayer's transaction has been held to qualify is subsection (b)(3) which provides—

(3) Termination of shareholder's interest—

Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

And Section 302(a) applies,[4] through Section 302(b)(3), when, as Section 302(c)(2)(A)(i) requires,

stock is then cancelled, retired, or held as treasury stock. Code § 317(b).

---

[*] Of the Eastern District of New York, sitting by designation.

1. Appellee Georgia Dunn filed joint tax returns with appellee Herbert A. Dunn in the years in question. The appeal relates only to the tax consequences of the Bresee redemption.

2. That part of any distribution which is not a dividend is applied against and reduces the adjusted basis of the shareholder's stock. Code § 301(c)(2).

3. Redemption takes place if a corporation acquires its own stock from a shareholder in exchange for property—whether or not the

4. It would *not* apply if the taxpayer retained a proprietary interest, because Section 302(c) invokes the constructive ownership rule of Section 318(a)(1) in determining ownership of stock for Section 302 purposes. Under Section 318(a)(1)(A)(ii) the taxpayer would then, for Section 302 purposes, be treated as the owner of all the stock of Bresee before the redemption and would continue to be so treated after the redemption, because she retained a proprietary rather than a creditor interest in Bresee.

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor . . . .

Thus, if after the redemption the taxpayer retained an interest in Bresee other than as a creditor, the 1970 and 1971 payments to her would be treated as taxable dividends—to the extent of Bresee's earnings. Code § 302(d).

## I

Bresee had been established by taxpayer's father, and taxpayer acquired the stock from her father by inheritance, apparently in 1936. Bresee was the largest Chevrolet dealer between Buffalo and Albany. The appellee Herbert A. Dunn was never a director or stockholder of Bresee; he had been in the automobile business since 1925 essentially as a salesman, and he had been general manager and for a time, until 1951, president of Bresee. In about 1951, however, taxpayer's son William B. Dunn became president of Bresee, and, at about the same time, apparently with the encouragement of General Motors Corporation ("GM"), the grantor of the Bresee franchise, the taxpayer transferred 125 shares of her stock to her son, and, following that, made yearly gifts of stock to her three children until they owned a majority of the stock.

There was testimony that GM wanted William Dunn to own a majority of the stock. By 1970 appellee Herbert Dunn was seventy-seven years old and taxpayer was seventy-three. The taxpayer wished to spend most of her time in Florida, and she did not want to have any business responsibilities. Appellee Herbert Dunn, while continuing as a salesman with Bresee, also planned to spend part of each winter in Florida.

Judge Tannenwald found on ample evidence that the taxpayer wished to dispose of her stock because she had been advised that it created a liquidity problem from an estate planning point of view, and because she and her husband wanted additional income, as they advanced in age, and Bresee had not paid any dividends except in one year. In the negotiations between the taxpayer and Bresee each party was represented by separate counsel.

Such were the general circumstances when the taxpayer entered into the May 27, 1970, Stock Purchase Agreement (the "Agreement") with Bresee. In the Agreement the taxpayer agreed to sell or redeem from Bresee, and Bresee agreed to purchase or redeem from the taxpayer the 249 shares of the capital stock of Bresee that she owned for $335,154, to be paid $100,000 on June 1, 1970, and the balance by Bresee's executing and delivering, payable to the taxpayer, a promissory note in the amount of $235,154 with interest at 5% a year; the note was payable $55,154 and one year's interest on June 1, 1971, and the balance in ten installments of $23,311.80 payable on June 1 of each year through 1981. The Agreement recited that Bresee operated as a Chevrolet franchise subject to all of the terms of the franchise agreement with GM, and that among the franchise terms was one requiring Bresee to maintain a certain "Owned Net Working Capital" in order to retain the dealership. The Stock Purchase Agreement stated that the parties understood that the Owned Net Working Capital requirement would prohibit Bresee's paying any principal or interest under the Agreement if payment would reduce Owned Net Working Capital to an amount less than required by the franchise agreement or unless payment permitted the dealer to retain at least 50% of net after tax profits to be added to surplus. It was then agreed, with respect to payment of principal or interest under the Agreement, or on the accompanying ten year promissory note, that

. . . if . . . the making of any payment thereunder would result in a violation of both said requirements, then and in such event, the due date of such payment or the part thereof which would result in such violation, shall be postponed until such date as when said payments or a part thereof can be made and still meet either the requirement in re-

gard to "Owned Net Working Capital" or the requirement in regard to retention of 50% of net profits after taxes.

On June 1, 1970, Bresee redeemed all 249 of taxpayer's shares and paid taxpayer $100,-000. After the redemption the taxpayer was not an officer, director, or employee of Bresee and through the date of trial had not acquired any stock in Bresee. After the redemption Bresee had 221 shares of stock outstanding, 143 of which were owned by William Dunn; each of his two married sisters owned 39 shares.

Thereafter, in a new "Minimum Capital Standard Agreement" in effect for a year from November 1, 1970, between Bresee and GM it was agreed that the Minimum Owned Net Working Capital required by Bresee was $736,266, that Bresee had established or would at once establish its actual owned net working capital at $329,569, and that until Bresee's actual owned net working capital equalled the minimum, Bresee would retain 75% of its after tax net profits in the business. The GM agreement provided that

. . . to arrive at a dealer's actual *owned* net working capital at any given time, that is the net working capital available to the dealership which has been supplied by investment and earnings, all current asset reserves and *all* liabilities should be deducted from the total current assets . . . . Obligations secured by a mortgage on land and buildings used in the Dealership Operations are not deducted from total assets in determining actual *owned* net working capital. (Emphasis in original.)

The mortgage exception was put on the ground that dealers were not required to own the dealership premises, so that an equity in them represented a use of funds that would otherwise be available for working capital purposes.

On June 1, 1971, Bresee's financial condition was such that payment of the $55,154 and interest would have violated the GM Minimum Capital Standard Agreement, and, accordingly, the payments were in part "postponed" under the above quoted terms of the Stock Purchase Agreement. The taxpayer received only $45,260.34 in principal, and she received no interest in June 1971. The balance of the principal payment due on June 1, 1971, was paid in June 1972, and the interest of $11,757.70 due on June 1, 1971, was paid in September 1974. After June 1, 1971, no payments on principal were either timely made or made during the taxable year when due. Payments of $23,-311.80, the agreed annual payment amount, were made about a year or more late, on June 18, 1973, May 29, 1974, October 15, 1975, and July 27, 1976. At the time each payment was made, Bresee was in violation of the Minimum Capital Standard Agreement, although its net working capital was increasing each year.

While GM was not advised of each payment as it was made, it did receive monthly balance sheets and profit and loss statements; it did not object to Bresee's payments to the taxpayer. There was testimony, but Judge Tannenwald made no finding on this point, that before the redemption transaction Bresee never met the working capital requirement.

The "Termination of shareholder's interest" provision Section 302(b)(3), which accords sale or exchange treatment to redemptions of the stock of one shareholder if there is a complete redemption of all of the stock owned by that shareholder, applies to family corporations, not as some narrow and grudging exception to some otherwise general rule, but as a sensible and evident, explicit and appropriate definition of a type of capital transaction. The statute says simply that the capital transaction analysis applies if the retiring stockholder genuinely quits the company except to retain an interest as a creditor. Where a stockholder whose shares are purportedly redeemed in their entirety retains in some form the substance of stock ownership, then, as the Court put it in *United States v. Davis*, 397 U.S. 301, 307, 90 S.Ct. 1041, 1045, 25 L.Ed.2d 323 (1970), "such a redemption is always 'essentially equivalent to a dividend' within the meaning of that phrase in § 302(b)(1)."

Judge Tannenwald found on the evidence that the taxpayer was not an officer, director or employee of Bresee after the redemption, that up to the date of trial she had not acquired any stock in Bresee and that she had filed with the tax return the required agreement to notify the Secretary of the Treasury of any acquisition of interest in the company.[5] Hence the sole question is whether immediately after the distribution the taxpayer was anything more than a creditor of Bresee.

The Commissioner argues that the Treasury regulation, 26 C.F.R. § 1.302–4(d), defining the term creditor in the context of § 302(b)(3) stock redemptions, is decisive of the case when it is applied to the postponement of payment provision of the Agreement. The regulation reads (as it has read since 1955):

> For the purpose of Section 302(c)(2)(A)(i), a person will be considered to be a creditor only if the rights of such person with respect to the corporation are not greater or broader in scope than necessary for the enforcement of his claim. Such claim must not in any sense be proprietary and must not be subordinate to the claims of general creditors. An obligation in the form of a debt may thus constitute a proprietary interest. For example, if under the terms of the instrument the corporation may discharge the principal amount of its obligation to a person by payments, the amount or certainty of which are dependent upon the earnings of the corporation, such a person is not a creditor of the corporation. Furthermore, if under the terms of the instrument the rate of purported interest is dependent upon earnings, the holder of such instrument may not, in some cases, be a creditor.

The Commissioner's contentions rest upon the fact that under the Stock Purchase Agreement if the making of any of the installment payments to the taxpayer would result in Bresee's failing to meet the net owned working capital requirement and the 50% of net profit retention clause, then payment of all or part of the installment is postponed until the payment can be made in whole or part without transgressing the GM agreement.

The Commissioner's confidence that the terms of the regulation require the conclusion that the taxpayer was not simply a creditor is not supported by the facts in the case. The regulation is concerned with the redeeming stockholder's status in two directions. First, that the redeeming stockholder does not remain someone with rights greater or broader than those of an ordinary creditor, for example, having the right to convert the claim into stock, or the right to vote as a stockholder in the event of a default in paying interest or principal, or a right to inspect the books or the stockholders list. As the regulation says, the claim must not be in any sense proprietary. None of these indicia of proprietary interest is claimed to be present in the taxpayer's case. She retained no office, no vote, no right to resume her position as stockholder in the event of default, or to convert her claim into stock, or any other right which would return to her a measure of control and of proprietary interest.

The regulation then turns to a second aspect of proprietorship—equity ownership—that is, that the redeeming stockholder's claim as creditor must not be subordinate to the claims of general creditors. The Commissioner appears to assume in part of his argument that the Agreement did subordinate the taxpayer's claim to those of general creditors. Nothing in the agreement affects the rank of the taxpayer's claim as against general creditors, and there is nothing in the Agreement that, if Bresee had been put into liquidation, would have given any creditor a basis for arguing

---

5. Under Section 302(c)(2)(A) the constructive stock ownership rule does not apply if (i) immediately after the distribution the distributee has no interest in the corporation other than as a creditor, (ii) the distributee does not acquire any stock interest for ten years—other than by bequest or inheritance of stock, and (iii) the distributee files an undertaking to notify the Secretary of any such acquisition of interest and to retain the records necessary to apply a retroactive tax on the "redemption."

that he should be paid before the taxpayer was paid. It is certainly true that Bresee could not stay in business unless it paid its operating expenses as they came due, and that, in that sense, an ordinary trade creditor, with a right to insist on payment of his bill when due, stood in a different position than the taxpayer. But that is just the difference between any trade creditor selling on current account and a long-term creditor, secured or unsecured. Nothing in the Agreement gave trade creditors any standing whatever to insist upon Bresee's observance of GM's owned net working capital requirement. Indeed, in practical reality Bresee's general creditors were just as subject as the taxpayer to the invocation of the only sanction which GM had for enforcing the owned net working capital requirement, that is, termination of Bresee's Chevrolet franchise: the owned net working capital requirement could as easily be breached by incurring operating expenses as by paying the taxpayer.

The regulation then asserts that a person is not a creditor of the corporation if under the terms of the instrument the corporation may discharge the principal amount of its obligation by payments "the amount or certainty of which are dependent upon the earnings of the corporation." The Commissioner relies on this sentence ultimately, but it is not applicable. Only the time when the payments were made might be influenced by Bresee's owned net working capital position or rate of net profits after taxes, but neither the amount of the payments to be made nor the duty to make the payments was dependent on the existence of earnings. Neither the owned net working capital, nor the profit limitation aspect of the postponement clause in the Agreement defines the amount Bresee must pay under the Agreement or makes Bresee's earnings either the source or the measure of Bresee's obligation to the taxpayer. Bresee could pay the taxpayer from the proceeds of a mortgage on the dealership premises, or from capital contributed by the shareholders or raised on a new issue. The obligation to pay was unconditional and certain in its amount.[6]

The Tax Court did appear to accept as correct the Commissioner's argument that Bresee could discharge the obligation by payments the amount or certainty of which was dependent upon Bresee's earnings, a contention that must be rejected as an incorrect reading of the Agreement. The court's view was that the restriction on time of payment was not an arrangement voluntarily agreed upon between the taxpayer and Bresee as a means of enabling her to perpetuate a stockholder-like interest in Bresee but was a GM exaction to which the taxpayer and Bresee alike had to bow. Nothing in that submission to the realities of Bresee's business life reflected a retention of a proprietary interest in Bresee by the taxpayer; the court analogized the situation to one in which a payment restriction was imposed by law.

The regulation, then, does not support the Commissioner's position, for the instrument under review does not exhibit a single one of the characteristics given significance by the regulation. What is more important, the obligation here, to the extent that it differs from the classic debt of fixed amount and inexorable due date, does not differ in the direction of being a proprietary or equity type of interest, but differs simply in being unmistakably debt, but of a seemingly somewhat inferior quality because of the postponement clause.

The distinction between deferment of payability and contingency of obligation is familiar, *Pierce Estates, Inc. v. Commissioner*, 195 F.2d 475, 477–478 (3d Cir. 1952), and does indeed mark a difference between true debt and obligations that are presently something less than debt, but which become debt when the contingency occurs and fixes

---

**6.** The final sentence in the regulation states that if the rate of "purported interest is dependent upon earnings, the holder  .  .  .  may not, in some cases, be a creditor." The interest rate under the Agreement is not made dependent upon earnings. Rather, the Agreement simply reflects recognition of the owned net working capital provision as excusing timely performance.

the obligation to pay. *See generally American Bemberg Corp. v. United States*, 253 F.2d 691 (3d Cir.), *cert. denied*, 358 U.S. 827, 79 S.Ct. 45, 3 L.Ed.2d 67 (1958); *United Gas Improvement Co. v. Commissioner*, 240 F.2d 312, 318 (3d Cir. 1956); *cf. Island Petroleum Co. v. Commissioner*, 57 F.2d 992, 994 (4th Cir.) (taxpayer to lose advances only if operations unsuccessful; if successful, to receive its advances back; the advances were, therefore, loans), *cert. denied*, 287 U.S. 646, 53 S.Ct. 92, 77 L.Ed. 558 (1932).

## II

The Commissioner at one point disclaims the contention that the owned net working capital provision is a subordination provision, but his argument really contends just that in pressing the limitation-to-earnings point, and in arguing that the regulation must be interpreted literally and given the force of law—denying debt quality and ascribing proprietary quality to the taxpayer's interest.

While the regulation, Section 1.302–4(d), has not been changed since it was promulgated late in 1955, and it would ordinarily be entitled to the deference owed to regulations that have survived unchanged repeated amendments of the Code, *United States v. Correll*, 389 U.S. 299, 305–06, 88 S.Ct. 445, 448–49, 19 L.Ed.2d 537 (1967), it is at best an interpretive and not a legislative regulation, since it was not promulgated under the authority granted by Section 385 of the Code to prescribe regulations to determine whether a corporate interest is to be treated as stock or debt. *Cf. Goldman v. Commissioner*, 497 F.2d 382, 383 (6th Cir. 1974) (regulations on moving expenses adopted under the specific authorization of Code § 217(h)), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 295 (1974); *Union Electric Co. v. United States*, 305 F.2d 850, 853–54, 158 Ct.Cl. 479 (1962) (regulations governing consolidated returns for affiliated corporations promulgated under Int.Rev. Code of 1939, § 141(b)). Section 385 of the Code, added in 1969, in authorizing the Secretary to prescribe regulations for determining whether a corporate interest is to be treated for purposes of the Code as stock or indebtedness, sets forth five "factors"—including subordination—which the Secretary may include in his regulations. No regulations have been promulgated under Section 385, although regulations issued under Section 385 might carry more weight than the current regulation because considered "legislative." *See Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 1717–21, 60 L.Ed.2d 208 (1979) (distinguishing between "substantive rules" on the one hand and "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" on the other); *Board of Education v. Harris*, No. 79–6006, slip op. at 5401, 5428–30 (2d Cir. Nov. 1979) (same distinction). The case law presents the background for reading such an interpretive regulation as is here involved.

■ It has not been doubted since *John Kelley Co. v. Commissioner*, 326 U.S. 521, 526, 530, 66 S.Ct. 299, 302, 304, 90 L.Ed. 278 (1946), that the question whether an interest is truly a stock or debt interest, and whether the payments made upon it are truly deductible interest or are non-deductible dividends, is determined typically on the total facts surrounding the creation and use of the instrument and not by its possession of some single characteristic. In *Kelley* the Court held that amounts paid as "interest" on noncumulative income debentures that were subordinated to general creditors but preferred over common stock could properly be held by the Tax Court to constitute interest on indebtedness and deductible. In passing on the question whether a certain subordinated interest was debt or equity in *Republic Supply Co. v. Commissioner*, 66 T.C. 446, 455 (1976), *aff'd in unreported decision*, [1979 Citator] Stand.Fed.Tax Rep. 90,128 (10th Cir. Dec. 29, 1978), the Tax Court said:

> Although a variety of related relevant factors have been established, it is clear that no one element is determinative and that it is the individual factual pattern of each case, which obviously differs, that brings forth those elements on which the ultimate conclusion is based.

*See also Scriptomatic, Inc. v. United States*, 555 F.2d 364, 373 (3d Cir. 1977).

So, in *Estate of Lennard v. Commissioner*, 61 T.C. 554, 563 (1974),[7] the factor of subordination coupled with the circumstance that a selling stockholder continued to render accounting services to the corporation did not convert the corporate undertaking to pay for the shares into a proprietary interest. In *Hoffman v. Commissioner*, 47 T.C. 218 (1960), aff'd, 391 F.2d 930 (5th Cir. 1968), the Tax Court held that the taxpayer, owning 5% of the shares, was the sole stockholder of the family corporation, although his mother, in transferring the 5% interest to him and contracting to sell her remaining 95% to the corporation, had retained possession of all the stock in escrow, and would, in the event of default, become again the sole owner of the stock, freed of any right of redemption. *See also Lisle v. Commissioner*, 35 T.C.M. (CCH) 627 (1976) (although corporation had twenty years to pay for shares, the shares were pledged to secure payment, and selling stockholders retained the right to vote, transaction held an exchange within § 302(a)); *Estate of Mathis v. Commissioner*, 47 T.C. 248 (1966), Acq. 1967–1 C.B. 2 (distribution qualified under § 302(a)); *Lewis v. Commissioner*, 47 T.C. 129 (1966) (installment sale of shares qualified under § 302(a) although selling shareholder retained right to vote and a nominal office as vice-president and director); *Oak Motors, Inc. v. Commissioner*, 23 T.C.M. (CCH) 520, 523–24 (1964) (finding debt despite subordination of note given to stockholder; interest deductible).

Neither under the language of the regulation relied upon nor under the cases which have dealt with the "debt or equity" question is there any basis in the present case for holding that the taxpayer had any interest in Bresee other than an interest as a creditor after the closing under the Stock Purchase Agreement.

Affirmed.

---

7. Acq. 1974–2 C.B. 3 (in result), withdrawn and non-acquiescence published, 1978–37 I.R.B. 5.