DONAL R. MYRICK AND RACHEL J. MYRICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Myrick v. Commissioner
Docket No. 4665-88
United States Tax Court
T.C. Memo 1990-368; 1990 Tax Ct. Memo LEXIS 383; 60 T.C.M. (CCH) 166; T.C.M. (RIA) 90368; July 19, 1990, Filed *383 Decision will be entered under Rule 155. Daniel C. Perri, for the petitioners. J. Craig Young and Shuford A. Tucker, Jr., for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1981, 1982, 1983, and 1984 in the respective amounts of $ 3,078.60, $ 12,537.00, $ 3,294.00, and $ 1,967.00. By amended answer respondent claimed an increased deficiency for 1984 in the amount of $ 7,576.00 making the total deficiency in issue for that year $ 9,543.00. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only whether a horse boarding and training activity engaged in by petitioners during the years here in issue under the name of Hollytree Stables was an activity not engaged in for profit within the meaning of section 183. [1] FINDINGS OF FACT Petitioners, husband and wife, who resided in Fort Walton Beach, Florida, at the time their petition in this case was filed, filed joint Federal income tax returns for the *384 calendar years 1981, 1982, 1983, and 1984 with the Internal Revenue Service, Atlanta, Georgia. At the beginning of 1981 and for some years prior thereto, Donal Myrick (Mr. Myrick) worked for Science Applications, Inc. (SAI) as the division manager of its system and operations analysis division. He felt pressured by his work. Mr. Myrick is a mathematician and physicist. The pressure Mr. Myrick felt in his work was increased by the sudden death from a heart attack at a relatively young age of his immediate superior. Mr. Myrick felt that he and his immediate superior were similar in personality and background and both had very high stress jobs. For a few years prior to 1981 Mr. and Mrs. Myrick had been considering some activity that they might develop to enable Mr. Myrick to do less stressful work. Both Mr. and Mrs. Myrick had been reared on a ranch and both were interested in horses and stables. Mr. Myrick had owned and ridden a horse up until he was approximately 15 years old. Petitioners have four children who at the time of the trial of this case in April 1989 ranged in age from 18 to 26. Their daughter, Lynn, was still only 12 in early 1981 but had been taking riding lessons *385 for some time at Wimberly Riding Stables in Niceville, Florida (Wimberly). Lynn enjoyed these riding lessons and by the age of 12 had developed into a good rider and was already participating in horse shows. Lynn's grandmother had given her a horse some years prior to 1981. The horse had been kept on the grandmother's farm in Alabama. Petitioners' daughter, Amanda, who was about two years younger than Lynn, was also interested in horses. This interest by petitioners and their daughters in horses and riding, as well as Mr. Myrick's desire for a less stressful life style, caused petitioners to decide to enter a horse boarding/training activity. Mrs. Myrick in 1981 and for some time prior thereto, and throughout the years involved in this case, was employed as a logistics management specialist with the United States Air Force. The owner of Wimberly, where Lynn took riding lessons, died shortly prior to 1981 and the property on which the stables were operated was put up for sale. Petitioners discussed with the principal instructor at Wimberly, a Ms. Mahilcik, whether they would be able to rent the stables which had been owned and operated by Wimberly. Ms. Mahilcik told petitioners *386 that she did not believe it would be possible to rent the Wimberly property since it was being offered for sale and not for rent. The Wimberly property was later sold to a veterinarian who discontinued the riding stables. Petitioners asked Ms. Mahilcik, whom they had come to know quite well, about the level of business being generated by Wimberly. She told petitioners that normally the gross receipts were between approximately $ 2,700 and $ 3,000 a month, compared with operating expenses of $ 1,000 to $ 1,200 per month. The gross receipts included fees of $ 50 per month per horse for boarding horses owned by 40 to 50 students and fees for instruction in riding. Petitioners were aware that Ms. Mahilcik was not the business operator of Wimberly but did know that she was the chief instructor. Petitioners also discussed the horse business with several other individuals, none of whom was engaged in operating a riding academy of the type contemplated by petitioners. After petitioners learned that the Wimberly property would not be available, they investigated the possibility of other locations that they might rent to operate a horse boarding/training activity. At the beginning of 1981 *387 they started a horse boarding/training activity under the name Hollytree Stables at space rented at Live Oak Stables. Later that year they moved to a larger space rented at Seven Pines Ranch. Both Live Oak Stables and Seven Pines Ranch were located in the Fort Walton Beach area. Soon after they began their horse boarding/training activity petitioners realized that they could not generate a profit from the activity operating in the type of rental space they were using and decided to purchase their own stables. At first they began to look for suitable property on their own but later consulted a realtor. The realtor located 3 acres of property at 732 Hart Road, Fort Walton Beach, and petitioners began negotiating for its purchase at the end of 1981. At that time Mr. Myrick resigned his position with SAI. Petitioners thought that they would be able to use the proceeds of Mr. Myrick's employee stock ownership plan with SAI as part of the purchase price of the property at 732 Hart Road, Fort Walton Beach and, therefore, were very interested in purchasing the property as soon as possible. At that time petitioners were unaware that Mr. Myrick would not be able to terminate his plan and *388 obtain his funds until after a 12-month waiting period. However, even after becoming aware of this, petitioners proceeded to acquire the real property located at 732 Hart Road, Fort Walton Beach. They acquired this property in March 1982 for a purchase price of $ 70,000. After Mr. Myrick received the distribution of his funds from the SAI employee stock ownership plan, the funds received were applied to the indebtedness which petitioners had undertaken in order to purchase the Hart Road property in March 1982. At the time of its purchase, the only improvement on the property on Hart Road was a barn-like structure with eight full and 11 half stalls. Petitioners made a personal inspection of the structure but did not have it inspected by any third party. Petitioners had concluded from their inspection that the barn was in functional condition. However, after they acquired the property they became aware that it was in poor condition with rotten timbers and in need of rewiring. They also learned that the water supply to the property was unreliable. Because of its condition, petitioners were required to make extensive repairs and additions to the barn before it was suitable for the *389 use to which they wished to put it. Petitioners took possession of the property at Hart Road in April 1982. Immediately thereafter, petitioners and their daughters, Lynn and Amanda, began making repairs, renovations, and various improvements to the property. The first horses arrived on the property in June 1982. After the initial repairs and renovations to the Hart Road property were completed only the eight existing full stalls could be rented. However, petitioners began contemplating construction of a second barn with six stalls to give them a total of 14 stalls. The construction of this second barn was completed by some time in 1984. Petitioners had bought two horses and sets of tack in 1981, their first year of operation of Hollytree Stables. In 1981, they also purchased a horse trailer to transport these horses to horse shows. It was petitioners' plan to have their riding students ride the horses in horse shows. In 1983 petitioners purchased a third horse and purchased a fourth horse in 1984. At the time of the trial of this case, Hollytree Stables still owned these four horses. At some time during the years here in issue, petitioners sold one of these horses on an installment *390 arrangement, but the purchaser defaulted and petitioners took the horse back. During 1982 only four of the eight available stalls at the Hart Road property were rented at any one time. Petitioners' own horses occupied a stall each. The rental fee was $ 50 per month for stall space only. The owner of the horse was responsible for feeding the horse and cleaning the horse and stall. Some horse stables charge a considerably higher monthly fee in exchange for not only furnishing a stall but for feeding and cleaning the horse and stall for the owner. However, except for feeding on a limited basis, petitioners have never provided these services. It was petitioners' plan to buy older horses which would be suitable for giving riding lessons to children. At the time that Hollytree Stables began operating on Hart Road, the number of stalls available for rent at nearby stables was in excess of the number of prospective horse boarders. This excess of available stalls, which continued through at least 1984, created a buyer's market and kept stable operators, including petitioners, from being able to raise their monthly stall or boarding fees. While renting space at Live Oak Stables, petitioners *391 entered into an arrangement with an English riding trainer whereby the trainer gave riding lessons using petitioners' horses and the fees from the lessons were divided equally between petitioners and the trainer. This arrangement continued after petitioners purchased and moved their operation to Hart Road. It was ended in late 1983 or early 1984 primarily because the trainer was unwilling to pay for her liability insurance and also because Lynn, who was then about 16, had become old enough and her ability in riding had become sufficient that she was able to give lessons. The horses owned by Hollytree Stables have never been rented for recreational use. These horses are ridden only during lessons or occasionally by petitioners and by their daughters. Neither Mr. nor Mrs. Myrick often rode the horses. Mr. Myrick rode approximately once a month and Mrs. Myrick less often. Lynn did ride the horses, not only in connection with giving lessons, but to keep them in training and to show them, and Amanda sometimes rode the horses. During 1982 Hollytree Stables not only offered stabling of horses, but also training of horses, as well as giving riding lessons primarily to children and adolescents. *392 These same services continued to be offered throughout 1983 and 1984. In addition, petitioners began to sell hay and other supplies to persons boarding horses at Hollytree Stables. During 1982, petitioners considered instituting a therapeutic riding program for handicapped children but abandoned the idea when they discovered the cost of liability insurance which they considered prohibitive. Petitioners also considered the purchase and resale of horses. They did purchase two horses that they held for resale. One of these horses was sold, but the other became sick and had to be put out to pasture. Petitioners did not further pursue the purchase and resale of horses. In March 1984 petitioners incorporated their business as a subchapter S corporation under the name Hollytree Stables, Inc. Neither Mr. nor Mrs. Myrick ever gave riding lessons. Between late 1983 or early 1984, when the employed trainer left and the incorporation of Hollytree Stables in March 1984, Hollytree Stables did not have anyone giving riding lessons. Since the time of incorporation, petitioners' daughter, Lynn, has been the riding instructor and horse trainer for Hollytree Stables. Lynn was in high school in *393 1984 and 1985 and at the time of the trial of this case was a full-time college student. Because of being in school, Lynn has been able to give riding lessons or train horses only in the late afternoons and on weekends. During 1984, Lynn had an average of about six students. Most students took one lesson per week, but some of the more serious riders took two lessons per week. Only one or sometimes two of these students boarded their own horses at Hollytree Stables. All riding lessons lasted about 1 hour. Except where the student's own horse was used, the horses owned by the stables were used for the riding lessons. Some students who owned horses boarded them at stables other than Hollytree, but nearby. At the time of the trial of this case, Lynn had 12 regular riding students and others to whom she gave clinic lessons. Lynn spent an average of about 20 hours per week giving riding lessons. The fees from these riding lessons are treated as income to Hollytree Stables, Inc. The fee for each one hour lesson is $ 8.00 if the student rides one of the horses owned by Hollytree Stables, Inc., and $ 5.00 if the student uses his own horse and tack. Lynn has never been paid a salary for *394 teaching riding lessons for Hollytree Stables, Inc., or performing the number of other duties she performed in connection with the horse activity. Lynn normally works at the stables 4 or 5 hours per day during weekdays and spends either Saturday or Sunday and often both days working there. At the time of the trial and for some years prior thereto, Lynn had also done training of horses for Hollytree Stables, Inc. At the time of the trial, she was responsible for the training of eight horses. Some of these horses are boarded at Hollytree Stables, Inc., while others are boarded at Seven Pines Ranch, one of the nearby stables. Lynn trains four horses and gives lessons to four students at Seven Pines Ranch. She goes to Seven Pines Ranch at least twice a week to perform these duties. In addition to training of horses and riders, Lynn also provides basic veterinary care for the horses, oversees the shoeing of the horses, makes sure that feed is delivered on time, and sometimes cleans stalls. Lynn has had a personal riding trainer since she began seriously riding horseback at the age of 10. Her trainers have included a former Olympic equestrian gold medalist and other outstanding horsemen *395 or horsewomen. Lynn has participated in a large number of horse shows and has won many riding ribbons and awards. During 1982, Lynn's horse was boarded at Hollytree Stables, Inc., without charge. Lynn takes her students to various horse shows to participate in the horse shows and her students have also been successful in winning medals. Sometime in 1982 or 1983, Mr. Myrick consulted with G. David Miller, a CPA, concerning the record keeping and accounting practices used at Hollytree Stables, Inc. Mr. Myrick met with Mr. Miller three or four times to discuss various matters related to horse activities. It was at the suggestion of Mr. Miller, made in late 1983 or early 1984, that Hollytree Stables was incorporated. Mr. Miller has continued to perform accounting services for petitioners and Hollytree Stables. Mr. Miller also suggested computerizing the bookkeeping of Hollytree Stables and this was done in 1983 or early 1984. After having left SAI in late 1981, Donal Myrick accepted employment with BDM Corporation in late February 1982. He remained with BDM most of 1982, but in late 1982 he formed a business under the name of Spectrum Scientist and Software, Inc. (Spectrum), primarily *396 to do consulting work for the United States Air Force. Since its formation, Mr. Myrick has been president and sole shareholder of Spectrum. Spectrum has been a successful operation and at the time of the trial of this case it had 34 employees. After leaving SAI Mr. Myrick attempted to start a real estate business. This business was unsuccessful and Mr. Myrick discontinued it. Since the beginning of the operation of Hollytree Stables, Mr. Myrick has fed the horses on weekdays before going to his full-time employment with either SAI, BDM, or later Spectrum. He also spends time at the stables after work and on weekends making repairs and performing other duties including cleaning of stables. During 1984, Mr. Myrick also operated a computer software development company. However, Mr. Myrick has spent substantially all of his weekend time working at Hollytree Stables, particularly when extensive repairs were necessary and new construction of stables was being done. At the time petitioners began Hollytree Stables, Mr. Myrick considered himself to be a good Western-style rider and now considers himself to be a good English-style rider as well. In addition to going horseback riding *397 once a month, he sometimes helps with exercising the horses and has, at times, personally participated in some horse shows. Mrs. Myrick generally works at Hollytree Stables approximately two hours a day on weekdays and spends most of her weekends working at Hollytree Stables. She is responsible for renting stalls, paying bills, and other day-to-day bookkeeping. She is also responsible for seeing that the stable rules are complied with, particularly the rules about the riding of the horses. In addition, she performs various other duties such as making repairs, sweeping, cleaning stalls, and picking up trash. Petitioners' daughter, Amanda, also helps with the work at Hollytree Stables and rides the horses at the stable on a rather regular basis. Each October, petitioners attend a large quarter horse show, the Congress, in Columbus, Ohio. Usually their daughters, Lynn and Amanda, go with them. One year Amanda participated in some of the events at this show. Petitioners also took a 4-H Club riding team to a show in Katy, Texas, on one occasion. Petitioners are members of a number of quarter horse and hunter-jumper associations and subscribe to several horse-related periodicals. *398 Petitioners require prospective boarders of horses at their stables to prove that the horses are free of infectious diseases and to sign an agreement and liability release form. Petitioners have sponsored clinics and an annual 4-H Club fun day at Hollytree Stables. Between the taxable years 1981 and 1984, petitioners and Hollytree Stables, Inc., spent a total of approximately $ 200 on direct advertising. This advertising consisted of a standard line ad in the local yellow pages and brochures and flyers which were left at neighboring stables. Petitioners have maintained adequate books and records of income and expenses relative to their horse boarding and training activity. Such records have consisted of a computerized general ledger, bank statements, canceled checks, and invoices. Their horse boarding and training activity also has a separate telephone number and bank account. Mr. Myrick has extensive knowledge of and experience with computers. Hollytree Stable possesses all required sales tax and business licenses. Soon after it was incorporated Hollytree Stables, Inc. began leasing computer services to Spectrum for a fee of $ 650 per month. This leasing arrangement continued *399 through at least the end of 1985 and may have continued into early 1986. These lease payments were included in the gross receipts reported by Hollytree Stables, Inc., on its Federal income tax Forms 1120S for the taxable years 1984 and 1985. The following schedule is a summary of the income, expenses, and losses shown by petitioners on their Schedule C for Hollytree Stables and by Hollytree Stables, Inc., on its Forms 1120S with respect to the horse boarding/training activity for the taxable years 1981 through 1987: Gross
Operating
Year
Receipts
Expenses
Depreciation
Net Loss
1981
$   617.00
$  5,866.30
$  1,129.50  ($  6,378.80)
1982
894.00
19,399.00
14,205.00  (  32,710.00)
1983
1,234.00
28,380.00
12,885.00  (  40,031.00)
1984
655.00
6,151.00
2,780.00  (   8,276.00)
Schedule C joint returns of Mr. & Mrs. Myrick
1984
8,722.00
16,436.00
8,379.00  (  16,093.00)
1120S of Hollytree Stables, Inc.
1985
14,389.00
11,738.00
8,985.00  (   6,334.00)
1986
13,587.00
9,681.00
8,017.00  (   4,111.00)
1987
4,791.00
4,127.00
4,979.00  (   4,315.00)
1988
4,798.00
4,403.00
3,868.00  (   3,473.00) At the time petitioners acquired the property located at 732 Hart Road, they had no reason to believe that this real property might significantly *400 appreciate in value. Petitioners did not purchase or hold this property for eventual resale or with the objective to profit from any appreciation in its value. However, later when petitioners were assessing their financial situation with respect to Hollytree Stables and their investment therein, they became aware that there had been an increase in the value of the real property on which they operated their business and although they did not intend to sell the property, but in fact Lynn hoped to develop a business on the property that she might take over from her mother and father, they were aware that if it became necessary to sell, they could make a profit on the sale of the property. They were aware of the sale in November 1988 of Live Oak Stables which is immediately adjacent to Hollytree Stables for $ 155,000. The property of Live Oak Stables consisted of 3.4 acres. Live Oak Stables had barns which contained 40 to 50 stalls. However, the purchaser of the real property from Live Oak Stables bulldozed the barns and put a development on the property. Immediately to the north of petitioners' Hollytree Stables property, the Okaloosa County campus of the University of West Florida *401 is being built, so that the area around petitioners' stables is changing from a rural environment to a more urbanized environment. Petitioners' combined gross incomes from all sources other than their horse boarding and training activities during the taxable years 1981, 1982, 1983, and 1984 were in the amounts of $ 68,677.26, $ 82,803.00, $ 44,254.00, and $ 69,004.00, respectively. Petitioners on their Federal income tax returns for the years 1981 through 1983 claimed loss deductions from the Hollytree Stables activity in the amounts shown on their Schedule C as set forth in the schedule above. For the year 1984, they claimed the loss shown on the Schedule C for the period before incorporation as set forth on the schedule above and claimed a pass through loss of the loss shown on the Hollytree Stables, Inc., Form 1120S. Respondent in his notice of deficiency disallowed $ 6,378.80 of the loss from Hollytree Stables claimed in 1981, $ 27,422.00 of the loss claimed in 1982, and $ 30,570.00 of the loss claimed in 1983. Respondent for 1984 disallowed $ 7,459.00 of the loss claimed by petitioners from Hollytree Stables on the Schedule C attached to their return. In an amended answer, *402 respondent alleged that the $ 16,093.00 pass through loss claimed by petitioners from Hollytree Stables, Inc., should be disallowed on the ground that Hollytree Stables, Inc., was not a trade or business operated for a profit. OPINION Section 183(a) provides that if an activity engaged in by an individual or an S Corporation is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183. Section 183(b) provides that in an activity not engaged in for profit deductions which would be allowed without regard to whether or not an activity is engaged in for profit, are to be allowed, and other deductions which would be allowable if the activity were engaged in for profit, shall be allowed, but only to the extent that the gross income derived from such activity exceeds the deductions which are allowable without regard to whether the activity is engaged in for profit. An activity not engaged in for profit is defined in section 183(c) as an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. There are numerous cases dealing with *403 whether an activity is one engaged in for profit within the meaning of section 183. The ultimate question is whether the taxpayer entered into and continued the activity with the objective of making a profit. Although a reasonable expectation of profit is not required, the activity must be entered into and continued with an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Whether the requisite objective exists is a factual question to be determined from all the facts in the record with greater weight given to objective facts than a taxpayer's mere statement of his intent. Churchman v. Commissioner, 68 T.C. 696, 701 (1977). See also Dunn v. Commissioner, 70 T.C. 715 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Section 1.183-2(b), Income Tax Regs., lists a number of factors to be considered in deciding whether an activity is one engaged in for profit. Included in the factors listed are: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) *404 the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) the elements of personal pleasure or recreation which are involved in the activity. No one factor is controlling, but all are to be weighed in light of the overall facts disclosed. Here, the manner in which petitioner carried on the activity was certainly businesslike. Petitioners kept good records. They saw that reasonable rules with respect to riding and the horses boarded were enforced. All the facts shown with respect to the first criterion listed in section 1.183-2(b), Income Tax Regs., are favorable to petitioners. Petitioners did not have particular expertise in the details of running a boarding stable, or giving riding lessons, or training horses. They did have expertise with respect to horses and how to care for horses. Also, their daughter Lynn had great expertise with respect to riding and training horses, even at an early *405 age and greater expertise in these areas at a later age. Both Mr. and Mrs. Myrick were riders, and Mr. Myrick was a good rider. Petitioners were not beginning an activity with respect to which they had no knowledge. On balance, we consider the facts here to be slightly favorable to petitioners with respect to the second criterion listed in section 1.183-2(b), Income Tax Regs. There is nothing in the record to indicate that petitioners knew the economics of running a riding/training stable, but they did make some inquiries from an instructor at Wimberly, whom they knew fairly well. Although this instructor was not in the business end of operating Wimberly, she certainly could be relied upon to know the gross receipts and have some idea of the expenses. From her statements to them, petitioners had reason to expect that some profit might be made out of an operation such as that run by Hollytree Stables. They also consulted other people in the business, as well as consulted an accountant with respect to the set-up of their books. The time and effort expended by petitioners in carrying on the horse stable activity was extensive. Both Mr. and Mrs. Myrick spent several hours each weekday *406 and most of their weekends working with the activity and their daughters also spent time working there. The facts are very favorable to petitioners with respect to the third criterion set forth in section 1.183-2(b), Income Tax Regs.
Initially, an expectation that the assets used might increase in value was not a factor in petitioners' decision to purchase the property. They purchased the property expecting to operate it as a boarding facility for horses and for use in training riders and horses. After they had sustained losses in the beginning years of the operation, they became aware of the likelihood of their assets, particularly their real property used in the activity, appreciating in value. They viewed this increase in the value of their assets as a safeguard, if needed. It was petitioners' intent to use the property in the horse boarding/riding/training activity, and the increased value of their assets could be realized only by sale of this property. We consider criterion four to be neutral. The record does not show that petitioners carried on any other similar activities. The record does show that Mr. Myrick was very successful with Spectrum, a dissimilar activity, and *407 apparently had some degree of success with his computer software operation, also an activity dissimilar to the activity of Hollytree Stables. Apparently petitioners were not successful in an attempted real estate operation. The record shows this activity was carried on by petitioners for only a short time. Criterion five listed in section 1.183-2(b), Income Tax Regs., is also neutral. We have set forth petitioners' history of losses with respect to their horse stable activity. The losses were much larger in the beginning years than in later years. In each of several later years there was a positive cash flow, the losses being occasioned by depreciation deductions. In 1984 and 1985 the S corporation, Hollytree, had some income from renting of computer usage, which was not directly related to the horse boarding/training/riding activity. However, in each of the years 1986, 1987, and 1988, without receipts from the computer use, the income of Hollytree Stables exceeded operating expenses to a small extent. Since there was no profit earned in any year from the beginning of this activity throughout the history we have in this record, criteria six and seven of section 1.183-2(b), Income Tax Regs., *408 is a negative factor toward petitioners, but not as negative as it would be if the picture were worsening rather than improving in later years. The record shows that each petitioner earned a salary from other sources during the years 1981 through 1988 ranging from under $ 30,000 to about $ 40,000 a year. The indication from the record is that petitioners had very modest means aside from their salaries. In order to buy the property on which to operate the Hollytree Stables activity, petitioners used the funds from an employee stock plan that Mr. Myrick had accumulated at SAI. While the deduction of the losses from the horse stable activity was of some tax benefit to petitioners as an offset to their relatively modest salaries, overall the financial status of these petitioners was not such that they could continue to operate the horse stable activity at substantial losses. Criterion eight slightly favors petitioners. The record indicates that both petitioners were interested in horses. Clearly their daughter, Lynn, was very interested in horses and in riding. The record, however, shows that most of the work done by petitioners did not have elements of personal pleasure connected with *409 it. Petitioners did repairs, cleaned stalls, did routine bookkeeping, fed horses, and otherwise took care of the horses. They only occasionally rode a horse. Although both petitioners testified they enjoyed riding, the very limited amount of riding that petitioners did is a clear indication that they were not running a recreational operation. Much of the work, such as cleaning stalls, sweeping, and repair work, was menial work, which it is hard to believe would be recreation or personal pleasure for anyone. Petitioners' daughter, Lynn, appears to have gotten personal pleasure from teaching students and from showing horses in various horse shows. Lynn pointed out in her testimony that she made a point of her students showing horses and that they had won a number of medals. Lynn spent a great deal of time working at the stables giving riding lessons and training horses. While she enjoyed her work, the stables were not run for her personal pleasure. She was not paid a salary by Hollytree Stables. She was in high school or college and being supported by her family during all the years with respect to which we have data. If the operation continued as Lynn testified she anticipated *410 it would, it will have to produce income for her as salary or otherwise. Lynn testified that as she spends more time with Hollytree Stables she expects it to be a successful operation and, someday, hopes to acquire the operation from her parents and continue to run it successfully. From the record, we conclude that petitioners did not operate Hollytree Stables for their pleasure or that of their daughters, Lynn and Amanda. Criterion nine is more favorable to petitioners than respondent. Respondent points out that the large number of stables in the area with excess stall space when petitioners began Hollytree Stables should have led them to conclude that it would be very difficult to make a profit. Petitioners point to the increase in demand for the stalls of remaining operators after some of the stables in the immediate vicinity of Hollytree Stables went out of business. Without the giving of riding lessons and horse training as part of the Hollytree Stables activity, petitioners could not have hoped for a profit from their stable rental activity, unless they greatly increased their number of stables. However, the record shows increases in the instruction and training activities *411 of Hollytree Stables. This was always an intended and important part of the activity. Weighing all the evidence in the record and considering the various factors we have discussed, particularly the work done by petitioners in an effort to make the business successful, we conclude on the basis of the record as a whole, that petitioners did engage in the horse boarding/training activity with the objective of making a profit. Therefore, petitioners are entitled to deduct the agreed amount of their Schedule C losses from this activity in 1981, 1982, 1983, and 1984, and to deduct the agreed amount of the pass through loss from Hollytree Stables, Inc. in 1984. Because of issues disposed of by agreement of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as in effect for the years here in issue.↩