WILBUR R. LANGFORD AND ANNA L. LANGFORD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Langford v. Commissioner
Docket No. 13845-78.
United States Tax Court
T.C. Memo 1981-532; 1981 Tax Ct. Memo LEXIS 212; 42 T.C.M. (CCH) 1160; T.C.M. (RIA) 81532; September 22, 1981. Morris A. Sunkel, for the petitioners. Judy Jacobs, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION
*213 GOFFE, Judge: The Commissioner determined the following deficiencies in and additions to the Federal income tax of the petitioners: Taxable
Addition to Tax
Year
Deficiency
See. 6653(a), I.R.C. 1954
1975
$ 1,934.01
$ 96.70
1976
1,431.77
71.59
Due to concessions, the only issue before us is whether petitioners purchased and leased a single family residential house (the House) with the intent to make a profit within the meaning of section 183, Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners filed their joint Federal income tax returns for their taxable years 1975 and 1976 with the Internal Revenue Service Center, Kansas City, Missouri. At the time they filed their petition in this proceeding, petitioners resided in Valparaiso, Indiana. During his childhood, petitioner Wilbur Langford (Wilbur) was raised in Logan, Utah. He was familiar with the House because it *214 was situated in the neighborhood where he grew up and was next door to his great-aunt's house. He lived in Logan from approximately 1936, when he was seven years old, until 1954, when he joined the Armed Forces and subsequently attended graduate school, from which he graduated in 1969. In September 1969, petitioners moved to San Luis Obispo, California, and used most of their savings to make a down payment on a residence there. They did not have sufficient funds to make a large down payment on another house. They resided in California until 1974, when they moved to Iowa. Some time prior to June 30, 1970, Wilbur's father told Wilbur that the owner of the House, a Mrs. Larsen, had some real property for sale adjacent to property owned by family members and that petitioners could buy it if they were interested. The "real property" referred to was the House, and the "family member" was Wilbur's great aunt. Mrs. Larsen was not related to petitioners by blood or marriage, and was substantially older than either of them. The House has a total of five rooms and was built in 1910. The House belonged to Mrs. Larsen's parents from whom she had inherited it. She had lived there *215 many years as of June 30, 1970. Wilbur's father and an attorney whom he had engaged acted as petitioners' agents in negotiating the contract of sale with Mrs. Larsen. Wilbur discussed the proposed terms of the contract with his father over a period of weeks, maybe months. Petitioners and Mrs. Larsen executed the final contract on June 30, 1970, by which Mrs. Larsen agreed to sell the House to petitioners for a total consideration of $ 7,000 in the following form: (1) $ 100 cash down, paid on June 30, 1970; (2) $ 700 in the form of maintenance work to be performed by petitioners or their agents upon the House; and (3) $ 100 per month commencing June 15, 1970, until the entire purchase price was paid in full. No interest was charged, but Mrs. Larsen was given the right to reside in the House until the purchase price was fully paid. Upon full payment of the purchase price, Mrs. Larsen was to convey to petitioners by warranty deed a marketable title to the House free and clear of all encumbrances. Upon payment of the full purchase price and conveyance of title, Mrs. Larsen was to have an option to rent the premises for 5 percent of the total purchase price ($ 350) per *216 year, and was to be responsible for paying all utility costs. The petitioners did not consult with any real estate experts prior to and concerning the purchase of the House, nor did they have the House professionally appraised, or inquire into the zoning of the underlying land, prior to such purchase. Petitioners did, however, have the House appraised in 1978. At the time they acquired it, the petitioners felt that the House was actually worth far more than $ 7,000 and that they had made the purchase on most advantageous terms. Other, similar property in the neighborhood of the House was selling at higher prices. They expected that the value of the House would appreciate and that although the rentals to be received from Mrs. Larsen after passing of title (should she opt to remain) might be below prevailing market levels, the appreciation in combination with the low purchase price would more than offset any foreseeable deficiency. The balance of the purchase price was finally paid, and title to the House conveyed, in August of 1975. During the pay out period and thereafter Mrs. Larsen continued to reside in the House, exercising her option to stay on as a tenant at the *217 contractual rental. Petitioners and Mrs. Larsen amended the contract for years subsequent to 1975 by agreeing to increased rents. The rent for 1976 was $ 430 and for 1979 was $ 720. Prior to the final payment of the full purchase price, petitioners claimed no deductions whatsoever with respect to the House. They commenced claiming deductions for expenses and depreciation only after the date of the final payment, when Mrs. Larsen became a tenant and began paying rent. The petitioners maintained books and records of their rental receipts and expenses respecting the operation of the House. The House was petitioners' first rental property. Subsequent to 1970, petitioners acquired other rental properties, one of which was a triplex. Petitioners consulted real estate experts prior to and in regard to these subsequent purchases. The following table shows the income and expenses, by property, of petitioners' real estate activities during 1975 and 1976: LOGAN HOUSE
CALIFORNIA TRIPLEX
1975
1976
1975
1976
Rental Income
$ 114.00 $ 430.00 $ 7,345.00
$ 7,570.00
Cash Expenses
511.24 508.80 4,374.87
4,346.54
Depreciation
[1] 155.56 [1] 466.67 [2] 2,600.00
[2] 2,600.00
TOTAL EXPENSES
666.80 975.47 6,974,87
6,946.54
NET PROFIT
$ (552.80)
$ (545.47)
$ 370.13
$ 623.46
*218 AMES, IOWA,
SAVANNA, ILLINOIS, DUPLEX
APARTMENT
1975
1976
1975
1976
Rental Income
$ 1,350.00 $ 935.00 $ 3,900.00 Cash Expenses
880.29 1,527.38 2,810.66 Depreciation
[2] 624.12 [2] 535.00 1,343.32 TOTAL EXPENSES
1,504.41 2,062.38 4,153.98 NET PROFIT
$ (154.41)
$ (1,127.38)
$ (253.98)
The annual rentals paid by Mrs. Larsen for occupying the House were below the fair market rental for similar houses in the area. The price paid by petitioners for the House ($ 7,000 as of August 1975, when the sale was actually completed) was significantly below the fair market value of similar houses in the area. The Commissioner determined that petitioners' rental of the House to Mrs. Larsen was an activity not engaged in for profit within the meaning *219 of section 183. OPINION The pertinent parts of section 183 provide: SEC 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means *220 any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. To be able to take a deduction under either section 162 or section 212 in connection with an activity, the taxpayer has the burden to prove that he undertook and/or continued the activity with the primary intention and motivation of making a profit. Allen v. Commissioner, 72 T.C. 28, 34 (1979). The existence velnon of the requisite motive is a question of fact to be determined by scrutinizing the entire record. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976). The Income Tax Regulations promulgated under section 183 provide: Section 1.183-2. Activity not engaged in for profit defined. * * * The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances *221 must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. * * * (b) Relevant factors. In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. Among the factors which should normally be taken into account are the following: * * * The regulations then proceed to set out some of the factors which may be relevant in determining whether or not a profit motive exists. Respondent contends that petitioners have not borne their burden of proving that their rental of the House to Mrs. Larsen was a profit-oriented activity because they were locked into a $ 350 annual rental, probably for as long *222 as Mrs. Larsen lived, which was less even than the $ 467 annual depreciation. Thus, argues respondent, it was impossible at the outset for petitioners ever to make a profit. Respondent also points to the losses petitioners sustained for 1975 and 1976 with respect to the House, to the fact that petitioners did not obtain a professional appraisal of the House's value when they purchased it in 1975, and to the fact that petitioners did not and could not know how long Mrs. Larsen would live and remain in the House as evidence of their lack of profit motive. As a preliminary point, the evidence contradicts respondent's rather bleak portrayal of petitioners' short-term profit outlook. The record shows, and we have found, that the parties agreed to modify or amend the contract by providing for steadily increasing annual rents, which amounted to $ 720 in 1979. More significantly, petitioners appeared willing to incur short-term losses on the operation of the House in order to reap the benefits of potentially great long-term appreciation. Section 1.183-2(b)(4) of the Income Tax Regulations provides: (4) Expectation that assets used in activity may appreciate in value. The term *223 "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. Sustained unexplained losses over a period of time are indeed an indication that the activity was not entered into for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, incurring losses does not in itself negate, but is rather evidence to be considered in determining, the presence of a profit motive. Jasionowski v. Commissioner, supra at at 319. Moreover, we feel that the losses here can be explained in terms of the petitioners' overall scheme. Petitioners were in effect betting that in view of Mrs. Larsen's advanced age, she would be remaining in the House for a sufficiently short period of time to permit the anticipated appreciation to offset the current rental losses. Respondent makes much *224 of the fact that petitioners had no way of knowing how long Mrs. Larsen would live beyond August 1975 and thus be entitled to remain in the House at a submarket rental. Until we are able to accurately predict the future, however, lack of exact knowledge of events to come will necessarily characterized every business transaction. Every entrepreneur must rely upon statistical inference and informed expectations. Although no one can ever predict how long a given individual will live, it is certainly possible to arrive at expected, probabilistic life spans--actuarial tables form the entire basis of the life insurance industry. It is a safe statistical bet that an elderly woman will not live as long as a 45-year old man. The contract of June 30, 1970, represents a finely balanced distribution of potential benefits and burdens, and was arrived at after a lengthy period of negotiation. From petitioners point of view, they were able to purchase a rental house with minimal initial funds, for a very small total price, and with a potential for great future appreciation. These terms ideally suited their needs at the time. Wilbur was fresh out of graduate school, petitioners had *225 made a down payment on a residence in California, and had very limited funds available to invest. However, they committed themselves to making payments for a number of years prior to actually owning and being able to control the House and to renting it for nominal rates to Mrs. Larsen, after title had passed, for as long as she lived and chose to remain. Mrs. Larsen was able to continue living in and owning the House just as she had prior to June 30, 1970, while receiving cash payments. Even after conveyance of the House to petitioners, she could remain in the House for as long as she lived, if she chose, and pay a rental well below market rates. However, she did part with the House at an almost nominal price and relinquished the possible appreciation in its value from June 30, 1970, until conveyance of title. We conclude that there is nothing either patent or latent in the contract which indicates that it is the final expression of any other than an arm's-length bargain between the parties. It is frequently stated that to escape the limitations of section 183(b), the taxpayer need not have a reasonable, but only a bona fide, expectation of making a profit. E.g., sec. 1.183-2(a), *226 Income Tax Regs.; Dunn v. Commissioner, supra at 720. Thus, the fact that a taxpayer enters into what most would consider a "bad deal" does not in itself preclude a finding of the requisite motive. Therefore, even if petitioners had made a seemingly uninformed, ill-advised, even financially disastrous bargain, as respondent appears to contend, we would regard this not as dispositive but simply as another quantum of evidence to be weighed against petitioners. However, we conclude that far from being ill-advised, the transaction was hard-bargained and potentially very profitable to petitioners. Thus, the nature and structure of the agreement, including the mutually consented-to modifications made after 1975, point to the presence rather than the absence of a profit motive. One of the factors which we are exhorted to consider is the manner in which the taxpayer conducts the activity. The fact that he carries on the activity in a businesslike manner and maintains complete and accurate financial records points to a profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. Respondent appears to contend that petitioners were guilty of unbusinesslike conduct in not having *227 the House professionally appraised prior to buying it and in not checking out the zoning of the property upon which it was located. It would seem to us somewhat unnecessary for petitioners to have obtained an exact appraisal under the circumstances of this case, however. Wilbur's father was acting as their agent, was residing in Logan during the contract negotiations, was undoubtedly aware of what similar houses were selling for in the neighborhood and thus had a general idea of the value of the House. It is questionable whether an appraisal would really have much value in this context. All appraisals are subject to a substantial margin of error and may well be no more accurate than an informed "guestimate" resulting from an interested purchaser's pecuniary instinct. Moreover, we are not aware that it is the typical custom of potential purchasers to have the real estate they are interested in purchasing professionally appraised prior to the purchase. Thus, although a prepurchase appraisal would have been another indication of a profit motive, the lack of such an appraisal does little damage to petitioners' cause. [2]
*228 We agree with respondent that a prudent purchaser would look into the zoning of property he was considering buying. However, in this case, petitioners were obviously seeking residential rental property and the existing residential use as of June 1970 would certainly have appeared to a reasonable investor to be in accordance with zoning regulations. In fact, there would have been no need to investigate zoning unless petitioners were contemplating making a substantial change in its use, e.g., from single family dwelling to apartments. There is no indication that such a change was planned. Petitioners did maintain records of their rental of the House. On balance, we conclude that petitioners were businesslike in their conduct relative to the house. Finally, we quote from section 1.183-2(b)(9) of the Income Tax Regulations: (9) Elements of personal pleasure or recreation. The presence of personal motives in [the] carrying on of an activity may indicate that the activity is not engaged in for pfofit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other *229 than profit. * * * [Emphasis added.] We view this quotation as directly applicable to the case at bar. Although the contract may have been unorthodox, we can see no other reason why petitioners would have entered into it than to make a profit. They have never at any time used the House personally, and there is no indication that they ever will. Indeed, they are, legally unentitled to do so as long as Mrs. Larsen continues to occupy it. Since 1969 at the latest, petitioners have resided nowhere near Logan and, for aught that appears in the record, have made no extended visits there. The fact that the bargain the parties made was not garden variety furnishes no basis for denying that it was profit oriented. We accordingly hold that the petitioners purchased and rented the House with the dominant intention of making a profit. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
1. Petitioners claimed a higher figure based upon a cost basis which they concede to be erroneous. We have used the $ 7,000 basis determined by the Commissioner, a useful life of 15 years and straight-line depreciation, upon which both parties appear to agree. ↩
2. These are the values determined by the Commissioner and not disputed by petitioners.↩
2. We note that petitioners did↩ have the House appraised in 1978 in order to have some idea of its value. We feel that this action evidences an attempt to obtain feedback on the success of this investment decision, i.e., to determine to what extent the initially anticipated appreciation had eventuated. We seriously doubt that petitioners would have bothered with an appraisal had this rental activity been merely a "hobby." Thus, the subsequent appraisal tends to indicate a profit motive.