JOSEPH T. TRIPI and MIRIAM V. TRIPI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tripi v. Commissioner
Docket No. 8137-80
United States Tax Court
T.C. Memo 1983-483; 1983 Tax Ct. Memo LEXIS 312; 46 T.C.M. (CCH) 1094; T.C.M. (RIA) 83483; August 15, 1983. Edgar C. NeMoyer, for the petitioners. George W. Connelly, Jr., for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencicies in petitioners' Federal income taxes as follows: Year
Deficiency
1975
$23,094
1976
14,893
1977
23,094
The sole issue presented for our decision is whether petitioners' *314 thoroughbred horse racing, raising, and breeding endeavors constitute an "activity * * * not engaged in for profit" within the meaning of section 183(a) of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners, Joseph T. Tripi and Miriam V. Tripi, husband and wife, resided in Kenmore, New York at the time their petition was filed. They filed joint Federal income tax returns for the years 1975 through 1977 with the Internal Revenue Service Center, Andover, Massachusetts. Petitioners first became involved with thoroughbred horses during 1958 when petitioner Joseph T. Tripi (hereinafter referred to as Joseph) purchased a horse at an auction for $200. Petitioners have been involved in horse racing, raising, and breeding continuously from 1958 to the time of trial in March, 1982. During this period, the greatest number of petitioners' horses involved in racing in any one year *315 was approximately six. The greatest number of horses involved in breeding was approximately 15. [2] During the years in issue, 1975 through 1977, petitioners owned between 15 and 20 horses. From 1958 through 1972, petitioners maintained their thoroughbred horse operations primarily in Canada. Although they continued to race their horses in Canada after 1972, they moved their horses to western New York State and began concentrating their activities in that area during 1973. Petitioners have centered their operations in western New York State since that time. During the years in issue, petitioners raced their horses in Canada, New York, Florida, Maryland, and Pennsylvania. [3] During these years approximately 90 percent of their racing took place in New York State of which the lion's share was conducted at Finger Lakes Racetrack and Commodore Downs Racetrack. Many of the races in which petitioners *316 have entered their horses provide purses of between $8,000 and $10,000. At all times relevant to this case, such purses were distributed in roughly the following manner: Place of Finish
Percentage of Purse *
First
60%
Second
20-22%
Third
10-12%
Fourth
5- 6%
Petitioners regularly traveled to racetracks in New York State and Canada where the bulk of their horse racing was conducted. They spent time in the club houses of those tracks, ate meals there, and would retire to the paddock area after their horses had run to discuss the races with their trainers. They did not, however, travel to such distant locations as Maryland and Florida to see their horses race. Petitioners also did not ride their horses either professionally or for pleasure. One of the reasons petitioners moved the base of their operations from Canada to New York in 1973 was to take advantage of certain *317 financial incentives established by New York State to promote the breeding and development of thoroughbred horses in that state. In 1973, the New York Legislature enacted N.Y. Unconsol. Laws secs. 8048 - 8048e (McKinney Supp. 1979) which established the New York Thoroughbred Breeding and Development Fund. This fund is financed by a levy on pari-mutual betting pools and, for years after 1977, an equal levy on offtrack betting pools. Pursuant to N.Y. Unconsol. Laws sec. 8048-c.2.1. (McKinney Supp. 1979), the fund annually disburses "breeders awards" to the breeders of New York-bred thoroughbreds that finish first, second, third, or fourth in open races in New York State. Pursuant to N.Y. Unconsol. Laws sec. 8048-c.2.2. (McKinney Supp. 1979), the fund annually disburses "stallion awards" to the owners of New York stallions who have sired New York-bred thoroughbreds that finish first, second, third, and fourth in open races in New York State. At the time of trial, petitioners had received breeder awards of $1,690.50 for 1980, and $4,000 for 1981. Petitioners have never received a stallion award, however. This is due, in large measure, to the fact that they have never stood one *318 of their stallions for stud in New York State. In addition to breeder awards, petitioners also derived income from their horse breeding activities through stud fees. In a good year a good stallion could potentially be bred 40 times at $2,000 a breeding. At the time of trial, however, the greatest number of times any of petitioner's stallions have stood for stud in any one year was six. This occurred prior to 1975 and the highest stud fee received in that year was $500. Petitioners first began reporting the results of their thoroughbred horse operations on their income tax return for the taxable year 1958. For each of the years 1958 through 1972, they filed a single Schedule C as part of their return on which they reported the combined income and expenses from their activities. On their 1973 return and on each subsequent return up to the time of trial, [4] they filed a Schedule C for their horse racing endeavors and a separate Schedule C for their horse raising, and breeding endeavors. For each of the taxable years 1958 through 1960, petitioners *319 reported a net loss from their combined horse racing, raising and breeding operations. The parties, however, did not submit evidence into the record as to the amount of the loss for each of these years. For taxable years 1961 through 1972, petitioners reported the following gross receipts, expenses, and net losses from their combined operations on the Schedule C filed with their return: Taxable
Gross
Total
Net Profit
Year
Receipts
Expenses
(Loss)
1961
$ (5,104.00)
1962
$5,011.20
$16,817.75
(11,806.00)
1963
12,370.00
20,052.64
(7,682.64)
1964
4,180.40
14,442.45
(10,262.05)
1965
3,022.00
16,325.97
(13,303.97)
1966
8,775.00
21,053.00
(12,278.00)
1967
15,456.00
24,238.82
(8,783.02)
1968
23,720.80
38,156.16
(14,435.36)
1969
20,315.00
34,060.00
(13,545.13)
1970
(15,677.00)
1971
17,074.00
29,278.76
(12,204.76)
1972
13,656.00
35,595.91
(18,919.89)
For taxable years 1973 through 1980, petitioners reported the following gross receipts, expenses, and net profits or losses from their horse racing operations on the Schedule C filed with their return: Taxable
Gross
Total
Net Profit
Year
Receipts
Expenses
(Loss)
1973
$404.00
$15,598.45
$ (15,194.45)
1974
13,216.00
17,614.98
(4,398.98)
1975
23,410.15
21,821.08
1,589.07 1976
20,567.50
19,318.42
1,249.08 1977
6,937.00
17,104.91
(10,251.91)
1978
13,375.00
28,462.06
(15,087.06)
1979
17,030.00
26,779.18
(9,749.18)
1980
17,501.50
11,559.04
2,942.46 *320 For taxable years 1973 through 1980, petitioners reported the following gross receipts, expenses, and net losses from their horse raising and breeding operations on the Schedule C filed with their return: Taxable
Gross
Total
Net Profit
Year
Receipts
Expenses
(Loss)
1973
$10,150.61
$ (10,150.61)
1974
$1,460.00
10,823.78
(9,363.78)
1975
2,400.00
22,781.50
(20,381.50)
1976
2,000.00
25,851.95
(23,851.95)
1977
500.00
20,717.90
(20,217.90)
1978
1,450.00
11,566.60
(10,116.60)
1979
16,196.63
(16,196.63)
1980
7,240.50
16,335.48
(9,094.98)
Petitioner's cumulative reported losses since 1961 for their combined thoroughbred horse operations are as follows: Cumulative Losses *
Racing
Raising and Breeding
Combined
1961-72
$144,002.37
1973
$15,194.45
$10,150.61
169,347.43
1974
19,593.43
19,514.39
183,110.19
1975
18,004.36
39,895,89
201,902.62
1976
16,755.28
63,747.84
224,505.49
1977
27,007.19
83,965.74
254,975.30
1978
42,094.25
94,082.34
280,179.06
1979
51,843.43
110,278.97
306,124.87
1980
48,900.97
119,373.95
312,277.39
*321 At trial, Joseph estimated that he and his wife had spent approximately $100,000 to acquire all of the horses purchased between 1958 and the time of trial. He also estimated that all of the horses they owned at the time of trial were worth approximately $150,000. Petitioners have never received an offer for all of their horses, however, but on one occasion they did receive an offer of $15,000 for one of their horses. Petitioners oversaw and controlled all facets of their horse racing, raising, and breeding during the years at issue. They paid the bills, maintained the records of income and expenses; selected, hired, and discharged trainers; selected and inspected the locations at which the animals were kept; purchased and sold horses; and participated in decisions to breed and race their animals. In fact, it was not unusual for Joseph to devote over 20 hours in a particular week to his thoroughbred horse activities. During the years in issue, the books and records which petitioners maintained for expenses of their thoroughbred horse operations consisted of cancelled checks, check stubs, invoices, bills, a ledger book, and handwritten notes. Entries of expenses in the ledger *322 book did not include all of their expenses, but did include many references to dates, payees, and amounts. Payment of expenses by check came from a single checking account. This account was also used by petitioners to pay their personal expenses as well as the expenses of several other business endeavors. In taxable year 1977, petitioners began separating expenses in their ledger book between those for horse racing and those for breeding and raising horses. Prior to that time, they maintained aggregate expense records for their thoroughbred horse activities despite the fact petitioners had been filing separate Schedules C with their tax returns since taxable year 1973 for their horse racing endeavors, and for their horse raising and breeding endeavors. For the taxable years 1973 through 1976, petitioners have, in effect, made an after-the-fact allocation of expenses in order to prepare separate Schedules C. Despite petitioners' use of two separate Schedules C beginning with taxable year 1973 and despite petitioners' efforts to categorize expenses in their ledger book beginning with taxable year 1977, petitioners' horse racing, raising, and breeding endeavors have been closely *323 interrelated since 1958. Petitioners have kept and raced the offspring of their thoroughbreds. They have retired horses from racing and used them for breeding. They have also avoided gelding their stallions although aware that gelding stallions could improve or extend their racing potential.
With the exception of a few seminars, the only formal training petitioners have received with respect to their thoroughbred horse endeavors was a genetics course that Joseph took during 1935 when he was a sophomore in college. They have read and purchased numerous books about various facets of thoroughbred horses, however. Petitioners feel they are competent in dealing with their thoroughbred horse activities, but do not consider themselves "experts" in the field. In addition to their thoroughbred horse operations, petitioners have been involved in the ownership and operation of several motels, a construction company, and rental properties. During the years 1958 through 1974, the income from these endeavors and the cash flow generated by the depreciation of their rental properties furnished the funds with which petitioners financed their thoroughbred horse operations. During the years *324 in issue, petitioners continued to receive substantial levels of income which permitted them to carry the losses sustained in their thoroughbred horse operations. They received the following income from wages, interest, and dividends as well as gross proceeds from the sale of stock and other capital assets. Proceeds from Sales of
Year
Wages
Dividends
Interest
Stock and Capital Assets *
1975
$5,200
$8,125.59
$28,525.79
$190,764.66
1976
5,500
10,995.90
33,906.62
102,716.26
1977
2,200
13,446.34
55,503.32
15,301.25
OPINION During the years in issue, 1975 through 1977, petitioners were involved in the racing, raising, and breeding of thoroughbred horses. Petitioners sustained substantial losses annually from these endeavors. The sole issue before us is whether petitioners' involvement with thoroughbred horses is an "activity * * * not engaged in for profit" within the meaning of section 183. If so, petitioners are restricted as to the losses which may be taken with respect to such activity. Respondent contends that petitioners' thoroughbred horse *325 activities were not primarily motivated by hopes of profit. Respondent relies in large measure on the unbusinesslike manner in which the activity has been conducted and the long history of losses incurred by petitioners beginning in 1958. Petitioners maintain they entered into their activities with the expectation of making a profit and that they still expect to make a profit. We are convinced after a careful review of the entire record that petitioners did not conduct their thoroughbred horse activities in the years before us with the objective of making a profit. Section 183(a)[5] provides that no deduction shall be allowed to an individual for expenses attributable to an activity not engaged in for profit except as provided in section 183(b). Section 183(b) essentially states that losses in excess of income are disallowed with respect to such an activity. Section 183(c) defines the phrase "activity not engaged in for profit" to mean any activity other than one with respect to which deductions are allowable for the taxable year under section 162[6] or under paragraphs (1) or (2) of section 212. [7] Thus, only if deductions would be allowable under sections 162 or 212(1) or *326 (2) with respect to the activity, is that activity engaged in for profit. *327 A common prerequisite of deductibility under section 162 and paragraphs (1) and (2) of section 212 is a predominant purpose and intention of making a profit from the activity with respect to which the expenses are incurred. Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. an another issue, 615 F.2d 578 (2d Cir. 1980). The taxpayer's expectation of profit need not be a reasonable one, but the facts and circumstances must indicate that he had an actual and honest objective of making a profit. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645-46 (1982), affd. in an unpublished opinion (D.C. Cir. Feb. 22, 1983). Therefore, in essence, section 183 distinguishes between nondeductible hobby losses and deductible business losses. S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 489. Accordingly, in this case we must determine whether petitioners had an actual and honest profit objective in conducting their thoroughbred horse activities. Petitioners bear the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); *328 Rule 142(a), Tax Court Rules of Practice and Procedure. While ultimately we are deciding subjective intent, that intent can be ascertained from objective factors which are entitled to greater weight than a taxpayer's statement. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. per order (9th Cir., Mar. 25, 1981).
Before determining whether petitioners held the requisite profit objective as required by section 183, it is necessary to determine whether their horse racing, raising, and breeding endeavors during the years at issue constituted one, or alternatively, more than one "activity" for purposes of applying section 183. We understand petitioners to be arguing that they were engaged in two separate activities: horse racing as one activity, and horse raising and breeding as a second activity. [8] Respondent, on the other hand, contends petitioners' thoroughbred horse racing, raising, and breeding endeavors were components of a single activity for purposes of section 183. *329 Section 1.183-1(d)(1), Income Tax Regs., provides in pertinent part: In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings as a single activity or as separate activities. The taxpayer's *330 characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. In applying this regulation to the facts of the case before us, we agree with respondent that petitioners' thoroughbred horse racing endeavors during the years in issue comprise one activity for purposes of section 183. Petitioners began their operations in 1958 with one horse and there is no indication that petitioners' various thoroughbred horse endeavors had separate beginnings.From 1958 through 1972, petitioners reported the results of their activities on a single Schedule C each year. Although petitioners began filing separate Schedules C in taxable year 1973 for their horse racing, and for their horse raising and breeding, they have offered no explanation for this change. In fact, only in taxable year 1977 did petitioners begin separating expenses of racing from those of breeding and raising horses in the ledger book in which they recorded expenses. Prior to that time, petitioners had, in effect, made an after-the-fact allocation of expenses in order to prepare separate Schedules C. *331 Furthermore, all facets of petitioners' endeavors involved, to a large degree, the same horses. Petitioners have kept and raced the offspring of their breeding horses. They have retired horses from racing and used them for breeding. These facts indicate petitioners' thoroughbred horse endeavors were not conducted separately, but were economically and practically related. They constituted a unitary activity and must be so regarded for purposes of section 183. Having determined that petitioners were involved in only one "activity" for purposes of section 183, we must now determine whether petitioners conducted that activity with the requisite profit objective. Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. They are: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, *332 (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation. These factors are not exclusive and are to be applied according to the unique facts of each case. Accordingly, no one factor, or a majority of nine factors, need be considered determinative. Golanty v. Commissioner,72 T.C. 411, 426-27 (1979), affd. per order (9th Cir., Mar. 25, 1981); Benz v. Commissioner,63 T.C. 375, 382-83 (1974). An analysis of the relevant factors as applied to petitioners' thoroughbred horse operations follows. Factor (1): The manner in which the taxpayer carries on the activity.--The manner in which petitioners conducted their thoroughbred horse operations in many ways belies a concern for profits. They kept expense records, hired and changed trainers, bought and sold animals, read numerous books and articles, and attended *333 seminars about horses. Petitioners' conduct, however, is equally consistent with an activity pursued for pleasure, and is insufficient to demonstrate an objective to make a profit. Golanty v. Commissioner,supra at 430. Petitioners' decision to move their operation from Canada to New York State in 1973 in order to take advantage of certain "breeder" and "stallion" awards offered by New York State[9] would suggest, in particular, a concern for profitability. This action by petitioners must be viewed in light of the entire mosaic of petitioners' actions, however. The significance of petitioners' decision to move the base of their operations is considerably diminished when the probable return from such breeder and stallion awards is weighed against the large losses incurred by petitioners during the years at issue. In fact, petitioners never received an award from New York State prior to taxable year 1980 and then only in the somewhat modest sums of $1,690.50 and $4,000 for 1980 and 1981, respectively. Petitioners also paid the expenses of their thoroughbred horse operations out of *334 their personal checking account. Although the failure to maintain a separate checking account may tend to suggest the lack of a profit objective, the fact petitioners utilized their personal account to pay the expenses of several other business endeavors neutralizes any adverse inference that might otherwise be drawn. Factor (2): The expertise of the taxpayer or his advisors.--Petitioners have read numerous books about various aspects of their thoroughbred horse operations. They have also hired competent trainers to prepare their horses for racing. On the other hand, petitioners have had virtually no formal training and presented no evidence that would indicate they sought and relied upon experts in conducting their horse breeding operations. This factor, therefore, is not particularly helpful in bolstering either petitioners' or respondent's position. Factor (3): The time and effort expended by the taxpayer in carrying on the activity.--Petitioners devoted considerable time to their thoroughbred horse activities. In fact, Joseph estimated at trial that he spent approximately 20 hours per week overseeing their horse operations. Although this factor would normally *335 suggest an objective of making a profit, we think it is of little significance in the present case for two reasons. First, petitioners' efforts in carrying on their activity consisted of substantial personal and recreational aspects such as attending nearby racetracks to watch their horses race. Second, petitioners did not withdraw from another occupation to devote their energies to their thoroughbred horse activities. Section 1.183-2(b)(3), Income Tax Regs.
Factor (4): The expectation that assets used in the activity may appreciate in value.--At trial, petitioners estimated that they had spent approximately $100,000 to acquire all of their horses since beginning their horse operations in 1958. Petitioners also testified their horses were worth approximately $150,000 at the time of trial. Even granting petitioners' estimates, the appreciation in petitioners' horses since 1958 is modest at best. Given this rather modest appreciation and the losses which petitioners have incurred annually since beginning their horse operations, we do not think petitioners seriously expected their horses to appreciate in value to the point where they could realize *336 an overall profit from their operations. Factor (5): The success of the taxpayer in carrying on other similar or dissimilar activities.-- Section 1.183-2(b)(5), Income tax Regs. provides that the fact the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Petitioners have never been involved in an activity similar to their present thoroughbred horse activities. A consideration of this factor in the present case therefore would not be helpful. Factor (6): The taxpayer's history of income or losses with respect to the activity.--Petitioners have realized a loss from their thoroughbred horse activities each year since beginning their operations in 1958.The cumulative losses through taxable year 1980 exceed $300,000. Although no one factor is determinative of the taxpayer's objective to make a profit, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on taxpayer's true intention. *337 Section 1.183-2 (b)(6), Income Tax Regs.; Jasionowski v. Commissioner,66 T.C. 312, 322 (1976).Given the information in the record concerning the operation of petitioners' thoroughbred horse operations, we are convinced that petitioners had no actual and honest objective of realizing "a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Factor (7): The amounts of occasional profits, if any, which are earned.--Petitioners have not shown a profit for any year since beginning their thoroughbred horse activities in 1958. Factor (8): The financial status of the taxpayer.--During the years at issue, petitioners received dividends and interest ranging from $36,651.38 in 1975 to $68,949.66 in 1977. Petitioners also received considerable proceeds from the sale of stock and other capital assets ranging from $15,301.25 in 1977 to $190,764.66 in 1975. Factor (9): The elements of personal pleasure *338 or recreation in conducting the activity.--Petitioners testified at trial that they regularly traveled to racetracks in New York State where most of their racing was conducted. They derived considerable pleasure from these excursions and from managing their horse operations generally.Although the gratification received from an activity by itself is insufficient to cause the activity to be considered not engaged in for profit, it is clear that petitioners would not have been willing to sustain losses year after year from their horse operations were it not for their desire to continue a pastime that was enjoyable to them. In conclusion, after a review of all the facts and circumstances of this case, we hold that petitioners' thoroughbred horse operations were an "activity * * * not engaged in for profit" within the meaning of section 183(a), since they did not have an actual and honest profit objective in conducting their activity. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue unless otherwise indicated.↩
2. Petitioners have not been able to utilize their horses for racing during the period they are involved in breeding. It has been their experience that stallions do not run well if they are being used for studding, and mares are obviously unavailable for racing during gestation.↩
3. Since 1977, petitioners have also raced their horses in Massachusetts and New Jersey. Losses are cumulative in each of these columns.
*↩ No horses finishing after fourth shared in the purse except at Finger Lakes Racetrack where the fifth and sixth place finishers received 3 percent and 2 percent of the purse, respectively.
4. As of the time of trial, March 10, 1982, petitioners had not prepared their income tax return for the taxable year 1981.↩
*. Petitioners also realized partnership income of $6,400 in taxable year 1977.↩
5. Sec. 183(a) through (c) provides as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 6. Sec. 162(a) provides in pertinent part: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. ↩
7. Sec. 212(1) and (2) provides: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income.↩
8. Petitioners argue that they have shown a small profit from their horse racing endeavors for two of the three years in issue and presumably seek to rely on the presumption of profitability offered by section 183(d). Section 183(d)↩ provides that, in the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, if the gross income derived from such activity exceeds the deductions for any two of seven consecutive taxable years, then the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary.
9. See N.Y. Unconsol. Laws secs. 8048 - 8048(e) (McKinney Supp. 1979).↩