BERNARD D. WAGNER and ROSEMARY WAGNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wagner v. Commissioner
Docket No. 20881-80.
United States Tax Court
T.C. Memo 1983-606; 1983 Tax Ct. Memo LEXIS 179; 46 T.C.M. (CCH) 1550; T.C.M. (RIA) 83606; September 27, 1983. Edward R. Joyce, for the petitioners. Paul K. Voelker, for the respondent. COHEN
MEMORANDUM FINDINGS *180 OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $17,566 in petitioners' 1976 income taxes, and an addition to tax under section 6653(b) [1] of $8,783. After concessions by the parties, including a concession by respondent as to the addition to tax for fraud, the issues remaining for our determination are: 1. Whether petitioners' horse breeding and racing operations were engaged in for profit and, if so, the allowable deductions and investment credit attributable to such activities, and 2. Whether petitioners' music and music promotion activities were engaged in for profit and, if so, the allowable deductions and investment credit attributable to such activities. In the notice of deficiency, respondent disallowed under section 183 the deductions taken by petitioner with respect to his horse and music activities because petitioner had "not shown that the expenditures were ordinary and necessary business expense[s] nor * * * [had he] shown they were incurred in an activity entered into for *181 profit." (The interest expenses paid by petitioner in connection with these activities were allowed under section 163.) Although the substantiation issue under section 274 was not raised by respondent in the notice or in his Answer, it was tried by the consent of the parties. FINDINGS OF FACT Some of the facts in this case have been stipulated, and the stipulations of fact and attached exhibits are incorporated herein. Bernard D. Wagner and Rosemary Wagner are husband and wife and resided in St. Louis, Missouri, during the year in issue and when the petition in this matter was filed. They timely filed their 1976 return with the Internal Revenue Service in Kansas City, Missouri. Because the activities discussed herein were conducted by Bernard D. Wagner, all further references to "petitioner" will be to Mr. Wagner. During 1976, petitioner was engaged in business as a certified public accountant and operated his business as a sole proprietorship. Petitioner maintained two offices in his practice and spent anywhere from 5 to 10 hours per day at work. He reported net earnings from this accounting practice of $55,609.85 for 1976. (As a result of concessions in this case, *182 his net earnings from that source have been determined to exceed $58,000.) On a separate Schedule C, petitioner reported a net loss of $14,434.67 from the activities of "Bar W Enterprises" (Bar W), which was a horse breeding and racing operation. On another Schedule C, petitioner claimed a net loss of $13,088.46 from the activities of "Bernie Wagner Songs and Productions," which was a music production and promotion operation. Petitioner was 43 years old in 1976 and had four children. Bernie, Jr., was 22 years old, married and self-supporting. The other children, Diana, Angela, and Keith, were 15, 14, and 11, respectively, and lived with their parents. Bar W Enterprises
In December 1975, petitioner met Gene Huff, an owner of a horse riding arena and boarding stable in the St. Louis area named the Horse Palace. After visiting the Horse Palace and watching one of Mr. Huff's horses run, petitioner decided to buy the horse, although his previous experience with horses was limited to his job clearning stables when he was 12 years old. On December 15, 1975, petitioner bought the horse, a mare named Sugar Barrs, from Mr. Huff for $550. In early 1976, petitioner paid Mr. Huff *183 $300 for another horse, a Pony of America (a cross between a horse and a pony) named Cherokee Chief. Both horses were boarded and trained at the Horse Palace where Mr. Huff's employee, Danny DeRoy, was available to ride them, but these two horses were not ever raced or mated. Charley Hensley, Gene Huff's partner at the Horse Palace, told petitioner it would be better to race horses than to breed them, but he advised petitioner that the animals at the Horse Palace were unsuitable for racing. Mr. Hensley knew of a race horse in Oklahoma named Mr. Truckles, which he offered to board and train in exchange for half of its earnings if petitioner would pay the purchase price. Meanwhile, Danny had left the Horse Palace to work on a horse ranch, and he advised petitioner to buy one of the ranch's horses, a stallion named Straw Boss Money. Petitioner persuaded three friends, Martin Ronzio, John Wegman, and Emil Pozzo, to lend him $1,200 apiece in exchange for 25 percent each of any profits earned by petitioner from Mr. Truckles and Straw Boss Money. These two horses were purchased in May for a total price of $4,750. Shortly thereafter, petitioner bought one more horse, a state champion *184 halter horse named Bob's Rusty Leo, for $1,650. Petitioner testified at trial that an objective of his operations was to win races so the horses could get certified as winning quarterhorses and thus command stud fees. Also in May 1976, petitioner and John Wegman bought 32 acres of land in the St. Louis area that they called the "Bar W." The land included a very old barn, a garage with a restroom, a house, and a swimming pool. The house and swimming pool were located on three acres that petitioner and his partner transferred to petitioner's son, Bernie. In either 1976 or 1977, Bernie paid $15,000 for this property. In June, Mr. Hensley took Mr. Truckles and Straw Boss Money to Nebraska to race Mr. Truckles in a $50,000 Futurity while training Straw Boss Money. Mr. Truckles injured himself 2 weeks before the race, however, but he did win some elimination races prior to that time, earning $303 for petitioner, which was reported on his 1976 return. Mr. Truckles was unable to recover from his injuries and did not win any more races. The horses returned to St. Louis in August or September, but Mr. Hensley put them on his farm instead of the Horse Palace because he and Mr. Huff *185 had ended their business relationship. He charged petitioner $35 or $50 per month to board Straw Boss Money. That horse was never raced in 1976. Mr. Truckles was not raced again in 1976. Bob's Rusty Leo was trained for a month by Danny at the ranch and petitioner paid $125 per month for board, in addition to Danny's riding fee in an unspecified amount. The horse was then entered in competitions at the Horse Palace, where he won three trophies in halter class. Petitioner kept Bob's Rusty Leo at the Horse Palace for a month and in June moved him to the Bar W for training in pleasure class. By that time, petitioner and John Wegman had made an outdoor riding arena on the Bar W by smoothing off a section of pasture land and building a fence around the area. They had also cross-fenced much of the pasture area so that the horses could be moved from pasture to pasture. Of the five horses then owned by petitioner, only Bob's Rusty Leo and Cherokee Chief were moved to the Bar W. Two mature riding horses owned by petitioner's son, Bernie, were also kept at the Bar W in 1976. These horses were ridden by petitioner's children. Bernie, Keith, and Diana also rode Cherokee Chief on *186 occasion, although not frequently. Diana rode Bob's Rusty Leo as often as twice a week for exercise. Petitioner did not maintain any books of account in the name of or with respect to Bar W Enterprises. Neither did he maintain any bank accounts in the name of Bar W Enterprises. Although he subscribed to various horse periodicals, he did not undertake any formal education in horse racing and breeding, nor did he consult any persons other than the persons previously mentioned. He testified at trial that he received most of his "expert" advice after he began buying horses. He also testified that he often paid cash for supplies, but he did not offer receipts or other evidence of any cash expenditures. He did attend numerous shows at the Horse Place during 1976. Bernie Wagner Songs and Productions
Petitioner's father, oldest brother, and sister were all either professional musicians or performers. From about the time he was 12 years old until he was 20, petitioner took trumpet lessons and instruction in music theory and composition. He had the hobby of writing songs all of its life, but he wrote more frequently after 1968. With the help of Don Tweedy, a Nashville record *187 producer he met in 1969 who had produced several successful records, petitioner succeeded in having one of his songs published in 1974. In 1975, petitioner became acquainted with employees at KBK Recording Studio (KBK) in St. Louis and played his music for them to enthusiastic response. He recorded several of his songs at KBK. While at the studio he met an attractive singer named Randy Baird (Randy) and asked him to perform the vocal tracks on petitioner's demonstration tapes. In 1976, he sent a tape of one of his songs, "Bayou Baby," to Don Tweedy. Mr. Tweedy liked the song and particularly liked the singer. He told petitioner that they might be able to make "a bundle of money" and suggested that he produce in Nashville a session of four songs selected by petitioner and sung by Randy. Petitioner was unable to go to Nashville immediately because it was "income tax season" for his accounting practice, but in May he and Randy flew to Nashville to record. Don Tweedy produced four songs, three of them written by petitioner and one written by a third party. Petitioner paid for the living expenses for himself and Randy while in Nashville by cash and did not obtain receipts or *188 make contemporaneous records for these expenditures. Petitioner paid the production costs of recording in Nashville by check. String accompaniment was added in St. Louis in September 1976, and the production costs were paid for by petitioner by a check drawn on a new account that he opened in approximately September 1976 for the music business. Also in 1976, petitioner and Randy entered a management agreement and a recording agreement drafted by petitioner's attorney from samples provided by Don Tweedy. The agreements were not produced at trial; petitioner's uncontroverted testimony, however, was that, in exchange for his management services, he was to receive 20 percent of the net proceeds from personal appearances by Randy. Petitioner paid $1,600 to Randy between June and September 1976 by check. In addition, petitioner paid for copyrights for the songs that were recorded. Randy needed exposure for his singing, so petitioner hired four musicians to play with him, bought them uniforms and equipment, and paid them each $150 for rehearsals with Randy prior to public performances. He also agreed to pay them each $200 per week while performing. Petitioner then enlisted the *189 aid of a local booking agency, Bandwagon Booking, to help with arranging exposure for the band. The agency arranged one booking for 2 weeks at the Hotel Governor in Jefferson City, Missouri, and another for 3 weeks at a rock and roll club in Springfield, Missouri. The total fees for the performances were $5,750, which were paid directly to the band members. Petitioner accompanied the band to Jefferson City the first weekend of the engagement to make sure that the band performed properly and was received well. Petitioner did not receive any of the proceeds from either engagement and had to pay the booking agency $375 from his own funds. Petitioner received numerous complaints about the off-duty behavior of the band members, so he fired them after the Springfield engagement. Petitioner stopped promoting Randy's personal appearances pending the sale of the recording. He did not continue paying a salary to Randy. Meanwhile, petitioner and Don Tweedy were sending copies of the tape to radio stations and record companies around the country, in an effort to sell the recording.Aquarian Records was the company most interested in the recording, and representatives of the company came *190 to St. Louis to negotiate a recording contract, but the parties were not able to agree and negotiations ended. Early in 1977, the recording was taken to New York by Jackson Sanders, and in April 1977, Don Tweedy notified petitioner that Vanguard Records was interested in buying the recording, signing Randy as a recording artist, and promoting the record. Vanguard Records agreed to release a single by Randy with a song by petitioner on one side. The agreement with the record company was that after certain of the company's initial expenses were paid, 10 percent or "points" of the receipts from sales would go to petitioner and his group. Of that 10 points, petitioner's ultimate share was 2.05 points; in addition, he was to receive 3 points as composer, for a total of 5.05 points.The recording was released in 1977, but there is no evidence that any money was ever paid by Vanguard to petitioner.
Petitioner had a studio in the basement of his house in which he wrote and listened to his songs and to other music for ideas. He had an electric organ, a piano, tape recording equipment, and stereo recording and playback equipment in the room. Petitioner estimated that this room occupied *191 20 percent of his home and deducted on his 1976 return 20 percent of his total yearly utility bill for the house, including the gas, electric, water, and sewer bills. He also deducted one-third of his base telephone bill for his home and the cost of long-distance calls made in connection with his music activities. He paid his utility and telephone bills in cash and did not produce receipts for these payments at or before trial. He did not claim any depreciation of the part of the house that his studio occupied. ULTIMATE FINDINGS OF FACT Petitioner did not in 1976 have an actual and honest profit objective with respect to his horse activities. Petitioner did in 1976 have an actual and honest profit objective with respect to his music activities. OPINION Respondent contends that petitioner's activities with respect to his horses and his activities with respect to his song writing were activities "not engaged in for profit" within the meaning of section 183(a). Section 183 provides, in part, that if an individual's activity is "not engaged in for profit" only those deductions allowable regardless of a profit objective (such as interest or taxes) may be taken. The disputed *192 deductions are allowable, therefore, only if petitioner entertained an actual and honest profit objective in connection with his horse activities and his music activities. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. in an unpublished opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but there must be a good faith objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination of whether the requisite objective exists is to be resolved on the basis of all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof is on petitioner, Golanty v. Commissioner,72 T.C. 411 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981), with greater weight given to objective facts than to petitioner's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The regulations provide a list of factors relevant *193 in determining whether a taxpayer has the requisite profit objective. No one factor is conclusive, and we do not reach our decision herein by merely counting the factors that support each party's position. Sec. 1.183-2(b), Income Tax Regs.; Dunn v. Commissioner,supra at 720. Certain factors are given more weight than others because they are more meaningfully applied to the evidence in this case. Because the lack of profit objective with respect to one activity does not necessarily imply a lack of profit objective with respect to another activity, we address the activities separately where the factors suggest opposite results. We conclude that one of the factors, i.e., the financial status of the taxpayer, is neutral in this case. Bar W Enterprises
Manner in which the taxpayer carries on the activity.
Although petitioner is an accountant, he did not establish books and records to keep track of his expenditures. Thus, he was unable to provide the Court with contemporaneous records to substantiate cash expenditures for which receipts were not available. He was also unable to use internal records to ascertain where and how expenditures could *194 be either curtailed or shifted in order to produce a more profitable activity. There is no indication in the record that petitioner adopted new techniques or abandoned unsuccessful ones in any kind of organized manner. In fact, petitioner abandoned the exploitation of his one proven success, Bob's Rusty Leo as a halter class horse. Despite the risks and costs involved, petitioner went forward with buying horses although it appears he had not yet decided whether he would try to make a profit from breeding or from racing. In addition, petitioner did not board all of his horses on the Bar W after the facilities were ready although it probably would have been cheaper than paying for board elsewhere. Petitioner's method of operations was not very businesslike and suggests that he did not actually have a profit objective.
The expertise of the taxpayers or his advisors.
Petitioner admitted that his previous experience with horses was extremely limited, yet he did not study horse breeding or racing even informally prior to buying horses. Neither did he speak with any experts before his first expenditure. The people he eventually did consult and rely upon--Gene Huff, Charley *195 Hensley, and Danny DeRoy--were all trying to sell something to petitioner. There is no evidence in the record to suggest that Danny was anything more than an experienced rider or that Mr. Hensley was successful as a trainer. Each of these people gave petitioner conflicting advice, but petitioner did not try to resolve these conflicts. Instead, he simply followed the advice of all three men, which proved to be very expensive. The time and effort expended by the taxpayer in carrying on the activity.
Petitioner had his accounting practice, his music activities, and his family to occupy his time in addition to his horses, so it is understandable that he did not devote more time to his horses. With all of these other demands on his time, it is unlikely that petitioner could expect to make money from such a demanding and time-consuming enterprise as horse racing and breeding, especially when he had no previous involvement in the area. [2]
*196 Expectation that assets used in activity may appreciate in value.
Petitioner testified that some very successful horses have been known to command large amounts of money for stud services, but that any appreciation in value for his horses depended upon the horses being certified for stud fees. The horses would not be certified if they did not win races or other types of competition. Yet petitioner only attempted to race one horse and removed his only other competitive horse from exhibition. These actions indicate that petitioner did not expect his horses to appreciate in value, and he did not testify to the contrary. The success of the taxpayer in carrying on other similar or dissimilar activities.
Petitioner has a successful accounting practice but no previous experience in ventures as risky as breeding and racing horses. His previous business success was not of the type that portends success with horses, and he did not attempt to prove that he could make money as a horse breeder just because he made money as an accountant.
The taxpayer's history of income or losses with respect to the activity.
Because petitioner did not really begin his *197 horse racing and breeding activities until 1976 he does not have a "history" of income or losses. He did, however, lose in excess of $14,000 in his first year of operation and did not demonstrate to the Court that he had any ideas or plans that would remedy the problem in the foreseeable future. "The goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The amount of occasional profits, if any, which are earned.
Petitioner did report winnings of $303 from horse racing in 1976, but no profits. Elements of personal pleasure or recreation.
Petitioner admitted that at least one of his children rode one of the horses frequently and serveral of the children rode another horse on occasion, although his son kept horses on the Bar W for petitioner's children to ride. The amount of recreation or pleasure petitioner and his family derived from the horse activities may not be great enough *198 on its own to negate a finding of profit objective, but it explains, at least in part, his willingness to spend large sums of money without a profit objective. Petitioner has not satisfied even one of the factors that support a finding of profit objective, and thus we cannot find that he is entitled to the losses he claimed with respect to Bar W Enterprises that were disallowed by respondent. Bernie Wagner Songs and Productions
Manner in which the taxpayer carries on the activity.
Petitioner made concerted efforts to promote his music and Randy by working with Don Tweedy, who was a successful producer, hiring and rehearsing a band, and booking the band into clubs around the state. When the band members proved to be more trouble than they were worth, petitioner fired them. He also took steps to gain maximum personal benefit from Randy by signing him to management and recording contracts. He obtained copyrights to his songs so that he could receive royalties if the songs were performed or recorded. He also established a separate checking account for his music activities during 1976. Although petitioner could certainly have been more organized in keeping track *199 of his expenditures, his efforts to make a financial success of his music show a profit objective. The expertise of the taxpayer or his advisors.
Don Tweedy was an advisor with established success in his field, so petitioner's reliance on Mr. Tweedy's advice tends to support petitioner's claim that he had a profit objective. In addition, petitioner hired attorneys to draft documents and help formalize relationships, which is further indicia of petitioner's profit intent.
The time and effort expended by the taxpayer in carrying on the activity.
Although petitioner did not withdraw from his other activities to devote more time to Bernie Wagner Songs and Productions, he did actively participate in the creation and promotion of his music and his artist. Petitioner hired a booking agent who arranged engagements for Randy and the band, and his shift of responsibility to those with the time and ability to do the necessary work is not inconsistent with petitioner's profit objective. Expectation that assets used in activity may appreciate in value.
Although the language of the regulations under this heading (sec. 1.183-2(b)(5), Income Tax Regs.) refers *200 to land, it is equally applicable to any kind of asset used in the activity that is capable of appreciating in value. In the music industry, an artist is regarded as property. Petitioner was working with a performer who had the potential to become very valuable property because he was attractive as well as talented. Petitioner testified at trial that much of his potential for success in the music industry was dependent upon Randy's ultimate success, and we believe that petitioner expected ultimately to reap profits from his 20 percent share of Randy's fees. The success of the taxpayer in carrying on other similar or dissimilar activities.
Petitioner testified that the musicians at the recording studio in St. Louis were impressed with his music, and he had been able to get his music published in the past. This success may have contributed to petitioner's belief that he could make money in the music business. The taxpayer's history of income or losses with respect to the activity.
Because petitioner did not begin his music business until 1976, we do not have a history of income or losses to examine. Petitioner incurred losses from his music activities *201 in 1976, but "losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit," sec. 1.183-2(b)(6), Income Tax Regs. (Of course, if losses continued unabated over several years, a different conclusion might follow.) The amount of occasional profits, if any, that are earned.
We are not inclined to give much weight to this factor, because petitioner's first year of music activities is in issue. The music industry appears to be the kind of industry that pays extremely large amounts of money to those who succeed in it and "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Sec. 1.183-2(b)(7), Income Tax Regs.
Elements of personal pleasure or recreation.
Petitioner obviously derived great personal pleasure from his music activities, but "the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for *202 profit if the activity is in fact engaged in for profit as evidenced by other factors." Sec. 1.183-2(b)(9), Income Tax Regs.
Petitioner has succeeded in proving that "Bernie Wagner Songs and Productions" was an activity engaged in for profit and, in general, he is entitled to deduct the ordinary and necessary expenses incurred in connection with the activity. Respondent claims that petitioner should only be allowed to deduct $10,004.75, the amount substantiated to respondent's satisfaction, because petitioner could not provide receipts or contemporaneously made records for the balance. Section 274(d) requires petitioner to produce such proof before he is entitled to deduct his travel and entertainment expenses, and petitioner has not fulfilled this requirement. He therefore may not deduct any of the airfare to and from Nashville paid by him, or any of his lodging and entertainment expenses while in Nashville. Other expenses for which petitioner does not have receipts consist of $312 attributable to household utilities, [3] $432 attributable to telephone charges, and $600 paid to string musicians at KBK Studios. Section 274 is not applicable to these expenses, so we may consider *203 petitioner's uncontradicted testimony in this regard. We are convinced that petitioner did incur expenses of the above nature so we will apply the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930) to permit part of these expenses to be deducted. Bearing heavily against the taxpayer "whose inexactitude is of his own making," Cohan v. Commissioner,supra at 544, we find that petitioner is entitled to deduct $200, $300, and $500 for utilities, telephone, and musician expenses, respectively. While petitioner initially claimed to be entitled to an investment credit with respect to assets used in his music business, he has presented no evidence or stipulation that would enable us to make a determination on that issue and he has not addressed it by brief. We cannot, therefore, allow any such credit. Decision will be entered under Rule *204 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Compare Doyle v. Commissioner,T.C. Memo. 1982-694↩, wherein the petitioners demonstrated profit objective, in part, by the fact that they spent every weekend traveling with the horses to shows, and the entire family devoted substantial amounts of time to the enterprise.
3. Section 280A may have a bearing on the deductibility of utility expenses under these circumstances; respondent, however, did not raise the applicability of that section and petitioner did not have an opportunity to present evidence or argument on this issue. We, therefore, do not consider it.↩