JOHN R. ZWICKY and KATHLEEN M. ZWICKY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zwicky v. Commissioner
Docket No. 17235-83.
United States Tax Court
T.C. Memo 1984-471; 1984 Tax Ct. Memo LEXIS 207; 48 T.C.M. (CCH) 1025; T.C.M. (RIA) 84471; September 4, 1984. Steven C. Bahls, for the petitioner. Mark J. Miller, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: By statutory notice of deficiency dated April 4, 1983, responded determined deficiencies in petitioners' Federal income tax liabilities for 1979 and 1980 in the amounts of $4,998.14 and $2,984.00, respectively. The issues for decision are whether petitioners' fishing boat charter service was an activity engaged in for profit, and whether petitioners are entitled to an investment tax credit for the purchase of the boat. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners John R. Zwicky and Kathleen M. Zwicky are husband and wife, and resided in Brown Deer, Wisconsin, at the time the petition herein was filed.Petitioners timely filed their Federal income tax returns for 1979 and 1980 on a joint return basis. John Zwicky was employed full-time as an insurance underwriter until July 31, 1979, at which time his employer relocated the insurance business in a different city. John declined the opportunity to continue his employment at the new location because his *209 wife, Kathleen, a certified public accountant (CPA), was employed at a local savings and loan organization as an internal auditor. Petitioners' total wages received from their respective full-time jobs for 1979 and 1980 were $29,961.28 and $34,807.44, respectively. Petitioner was an avid sports fisherman and owned a 24 1/2-foot Gran Bateau boat that he used for recreational fishing. [1] When faced with the prospect of unemployment in mid-1979, however, petitioner decided that he could utilize his fishing expertise in a "paying enterprise" by chartering a boat to groups of fishermen and acting as guide for these fishing excursions on Lake Michigan. Although John was experienced in boating and fishing, he had never operated a charter boat service and knew little about the business aspects of such operations. Before offering his boat and personal services for charter, John analyzed the costs associated with a charter boat service with Kathleen, who is a CPA. Petitioners determined a charter *210 rate that would yield a profit if John was successful in acquiring for charters per week. The charter excursions were approximately five hours in duration and cost from $22.50 (in 1979) to $34.65 (in 1984) per person. This coat included use of the boat, fuel, and bait, and John was able to accomodate two charters per day. Petitioners thought that it was reasonable to expect that John would acquire at least four charters per week. John also obtained a commercial motorboat operator's license from the U.S. Coast Guard, a sport trolling license from the Wisconsin Department of Natural Resources, and a seller's permit. In order to obtain those licenses, petitioner passed a four-part written examination, a physical examination, and logged over 300 boating hours on Lake Michigan. Each of those licenses was required by law of all charter boat operators and John did not accept any charters prior to the time he obtained the licenses. John also purchased a Charter Insurance Policy which provided protection for the passengers of his charter boat service. After approximately two months of operating his 24 1/2 foot Gran Bateau as a charter, and at the request of one of his patrons, John *211 purchased a larger boat on July 22, 1979, a 30-foot Sea Ray Weekender, which he named "the Banana Split III." The Banana Split III was purchased for $41,405 and was financed partially by the trade-in of petitioners' Gran Bateau boat.[2] The larger boat enabled John to accomodate as many as six patrons, and was, in his opinion, the best possible boat for his charter operation. John anticipated that this boat would not appreciate in value and would no longer be suitable for charter use after 10 years. John performed nearly all of the maintenance work on this boat himself, which obviously diminished his expenses. In both 1979 and 1980, John offered charters on Friday, Saturday, and Sunday during June and July, and on every day of the week during August, September, and October. From August 1, 1979 through February 15, 1980, John had no employment outside of his chartering service. In February 1980, however, he became employed on a full-time basis as an underwriter for another insurance company, *212 but took vacation time off from that job if scheduled for a day-time charter during the week. John advertised his charter boat service through local newspapers, fliers, business cards, telephone book listings, and word of mouth. If John did not have a pre-arranged charter on a given weekend, he would usually go to the dock where his boat was located to distribute advertisements and in other ways promote his charter boat service. Kathleen rarely accompanied John to the dock and petitioners' son accompanied him there only occasionally. The financial records of the charter service were maintained by Kathleen. In 1980, petitioners began keeping a separate bank account for the charter boat service and also acquired a separate telephone line for exclusive use by the charter boat service. In 1979, petitioners had 16 paying charters and 8 non-paying charters. The non-paying charter excursions were primarily taken for promotional purposes, and were offered because 30% to 50% of all charter boat patrons are "repeat" customers. John believed these promotional fishing trips would encourage patrons to engage his services on other fishing excursions for a fee. To insure that his patrons *213 had a successful fishing trip, it was essential that John know where the fish were located, and he made one or two trips in 1979 (included in the eight non-paying charters) to search for schools of fish. Although John enjoys fishing, Kathleen does not, and their personal use of the boat was minimal, constituting approximately three one day trips during the two years in controversy. As a result of the paying and non-paying charters, which generated $1,339 gross income, petitioners incurred expenses (including depreciation) in 1979 in the amount of $9,301.08, and reported a loss of $7,965.08 on their 1979 Federal income tax return. In 1980, John made some changes in the promotion of the charter boat service, including increased advertising, participation in a local sports show, and relocation of his boat to a new, less expensive dock space that was leased by Admiral's Wharf, another charter boat service. John also negotiated an informal agreement with Admiral's Wharf, which provided that if Admiral's Wharf arranged more charters than it could accomodate, the overflow customers would be referred to John, who would receive 90% of the charter fee. The remaining 10% of the fee would *214 be retained by Admiral's Wharf as a referral fee. In 1980, petitioners had gross receipts from 13 paying charters of $1,039.50. Ten of these charters were referrals from Admiral's Wharf and three were arranged directly by John. Petitioners' expenses (including depreciation) in 1980 totalled $11,951.19 and they deducted $10,519.69 as a loss on their 1980 Federal income tax return. The schedule C expenses claimed by petitioners in both 1979 and 1980 were correctly computed and in fact incurred by petitioners. John continued to operate the charter boat service in 1981, 1982, and 1983 (years not in issue) and reported losses of $7,108.47, $6,481.55, and $6,424.64, respectively. The number of paying charters, however, increased to 30, 32, and 37 in 1981, 1982, and 1983, respectively. OPINION The first issue for decision is whether Section 183 [3] limits the deductibility of losses from petitioners' charter boat service in 1979 and 1980. Section 183(b) provides that if an individual's activities are "not engaged in for profit," only those deductions allowable regardless of whether a profit objective exists (such as interest and taxes) may be claimed. If a taxpayer realizes gross *215 income from the conduct of the activity, he can deduct all expenses attributable thereto up to the amount of gross income less those deductions allowed irrespective of a profit objective. A presumption that the activity was engaged in for profit will arise if the gross income derived from the activity exceeds the deductions attributable to it for two or more years in a period of five consecutive years. Section 183(d). Because petitioners sustained losses in the years 1979 through 1983, they are not entitled to rely on this presumption. Petitioners' expectation of profit need not be a reasonable one, but there must be a good faith objective of making a profit. Section 1.183-2(a), Income Tax Regs., Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination of whether the requisite profit objective exists is to be resolved on the basis of all the surrounding facts and circumstances of the case. Section 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,72 T.C. 411 (1979), affd. without *216 opinion 647 F.2d 170 (9th Cir. 1981). Greater weight is to be given to the objective facts than to petitioners' mere statement of their intent. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Section 1.183-2(b), Income Tax Regs., provides a list of nine factors to be used in determining whether an activity is engaged in for profit. These factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the asset used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. No one factor is conclusive and thus we do not reach our decision by merely tallying the factors that support *217 each side. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (2d Cir. 1979), affd. on another issue 615 F.2d 578 (2d Cir. 1980). Respondent does not contest the amount of the deductions claimed by petitioners in 1979 and 1980 or that they were in fact incurred with respect to petitioners' charter boat service, but asserts that petitioners did not engage in the charter boat service with an intent to make a profit. We disagree. Finding the testimony of petitioners and their witness to be credible, and based on the other objective criteria, we find that the totality of the facts and circumstances indicates that petitioners' charter boat service was an activity engaged in for profit. For example, Kathleen, a CPA, maintained in a professional manner accurate financial records for the charter boat service. She re-evaluated their way of doing business in light of the first year's losses, and made real improvements, such as the agreement with Admiral's Wharf, in an attempt to diminish losses and produce a profit in future years. Petitioners' advertised their charter service, albeit on a small scale, *218 and engaged in numerous other promotional activities in the expectation of enticing future customers to employ their services. Petitioners purchased insurance to protect their charter boat patrons and John became a licensed motorboat operator. John devoted substantial periods of time to the charter boat operation in spite of his full-time employment elsewhere. Indeed, according to petitioners' witness, Mr. Friedman (who was the owner of Admiral's Wharf), most charter boat operators, of which he is aware, also had full-time jobs in unrelated fields. In addition, Mr. Friedman himself testified that he worked full-time in an unrelated job during the first ten years his charter boat service was in operation. Mr. Friedman testified that John was at the dock and available for charters more often than most of the other charter boat operators at Admiral's Wharf. Also, the recreational use of the boat by petitioners' family was minimal. Although petitioner continued to sustain major losses during the first five years of his charter boat service, this alone does not necessarily indicate that the activity was not engaged in for profit. Losses can be expected during the start up phase *219 of many businesses. Churchman v. Commissioner,68 T.C. 696 (1977). The taxpayers in McLarney v. Commissioner,T.C. Memo. 1982-461, operated a charter boat service and sustained losses for all three years that they operated their service, yet their deduction of those losses was held not to be barred by section 183 because the facts indicated that they had an intent to make a profit. In McLarney, the taxpayers had carefully investigated the charter boat business. They changed their mode of operation to increase profitability. They spent substantial time and energy on a regular basis to operate the charter service, and they maintained accurate financial records. Petitioners herein have operated their charter service in a similar manner. We also note that although losses have continued throughout the first five years of petitioners' operation, these losses have declined (albeit slightly), and the number of paying charters in 1981, 1982, and 1983 was more than double the number of paying charters in 1979 and 1980. Believing petitioners to be honest and credible in their recitation of the facts herein, and in their assertion that the charter *220 boat service was an activity engaged in for profit, we allow the deductions they claimed with respect thereto. The second issue for decision is whether petitioners are entitled to an investment tax credit for 1979 for the purchase of their 30-foot Sea Ray Weekender, the "Banana Split III." Section 38(a) allows a credit against tax for investment in certain depreciable property; section 48(a)(1)(A) defines "certain depreciable property" as "tangible personal property * * * with respect to which depreciation is allowable." Depreciation is allowed only for property "used in a trade or business" or "held for the production of income." Section 167(a). In light of our holding that petitioners' charter boat service was an activity engaged in for profit, we find that the boat was held for the production of income and that petitioners therefore are entitled to the investment tax credit for the purchase of their boat in 1979. To reflect the foregoing, Decision will be entered for the petitioner.
Footnotes
1. Petitioner had owned two other boats prior to 1979, a 14-foot tri-haul, which was exchanged in 1977 for an 18-foot Sea Ray. These boats were used exclusively for recreational purposes.↩
2. Petitioners were allowed $15,000 as the trade-in value of the Gran Bateau, reducing their balance due on the Sea Ray Weekender to $26,305 which was financed over a 120-month period.↩
3. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue, unless otherwise indicated.↩